**IN THE UNITED STATE DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CANDY S. ORNER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 4:13-cv-00837-MWB-TMB |
| v. | ) | |
| | ) | Judge Brann |
| NATIONAL BEEF PACKAGING | ) | Magistrate Judge Blewitt |
| COMPANY, LLC | ) | |
| | ) | *ELECTRONICALLY FILED* |
| Defendants. | ) | |

**BRIEF IN OPPOSITION OF DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**


Respectfully submitted by,

McCarthy Weisberg Cummings, P.C.

May 5, 2014_____          /s/ Larry A. Weisberg_____
Date                                    Larry A. Weisberg, Esquire
                                           PA Bar I.D. #: PA83410
                                           lweisberg@mwcfirm.com
                                           2041 Herr Street
                                           Harrisburg, PA 17103-1624
                                           (717) 238-5707
                                           (717) 233-8133 (FAX)

                                           *Attorney for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CITATIONS       iv

I.     **PROCEDURAL HISTORY**       2

II.     **PRELIMINARY STATEMENT**       2

III.     **STATEMENT OF MATERIAL FACTS**       4

IV.     **STATEMENT OF QUESTIONS INVOLVED**       4

       A.     DOES ORNER'S CLAIM OF "DISCRIMINATION    4
               AND FAILURE TO PROVIDE A REASONABLE
               ACCOMMODATION PURSUANT TO THE
               AMERICANS WITH DISABLTIES ACT" FAIL
               AS A MATTER OF LAW

V.     **STANDARD OF REVIEW**       4

VI.     **LEGAL ARGUMENT**       6

       A.     Orner is a disabled person within the meaning of    7
               the ADAAA

            1.     Definition of "disabled"       7

            2.     Definition of "substantially limits"       7

       B.     Orner is an otherwise qualified to perform the    33
               essential functions of the job with or without
               a reasonable accommodation

            1.     Essential functions       33

            2.     Reasonable accommodations       36

            3.     Interactive process       39

            4.     Direct threat       54

5.    National Beef does not have a legitimate,                    59
      non-discriminatory reason for not allowing
      Orner to return to work

**VII.   CONCLUSION**                                               60

## **TABLE OF CITATIONS**

**CASES**                                                                    Page

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,                          5
    106 S.Ct. 2505 (1986)

*Aniskevich v. Blue Ridge Pressure Castings, Inc.*, CIV.A.                  34, 36
    3:08-0966, 2009 WL 3335545 (M.D. Pa. Oct. 14, 2009)

*Barlow v. Walgreen Co.*, 8:11-CV-71-T-30EAJ, 2012 WL 868807               27, 28
    (M.D. Fla. Mar. 14, 2012)

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358                     6
    (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262 (1993)

*Bowers v. NCAA*, 475 F.3d 524 (3d Cir.2007)                                   26

*Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196,                            55
    141 L.Ed.2d 540 (1998)

*Burch v. City of Nacogdoches*, 174 F.3d 615 (5th Cir.1999)                   37

*Bush v. Donahoe*, 964 F. Supp. 2d 401 (W.D. Pa. 2013)                      8, 31

*Canfield v. Movie Tavern, Inc.*, 13-CV-03484, 2013 WL 6506320             2, 18
    (E.D. Pa. Dec. 12, 2013)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2552,                      5
    91 L.Ed. 2d 265 (1986)

*Cohen v. CHLN, Inc.*, CIV.A. 10-00514, 2011 WL 2713737                    24, 25
    (E.D. Pa. July 13, 2011)

*Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318 (3d Cir.2003)                  33

*Cutrera v. Bd. Supervisors of La. State Univ.*, 429 F.3d 108                 40
    (5th Cir.2005)

*Deane v. Pocono Med. Ctr.*, 142 F.3d 138 (3d Cir.1998) (en banc)             33

*Doe v. County of Centre,* 242 F.3d 437 (3d Cir.2001)                                    55

*Eastman Kodak Co. v. Image Technological Services, Inc.*,                               5
    504 U.S. 451, 112 S.Ct. 2072 (1992)

*EEOC v. Hussey Copper Ltd.,* 696 F.Supp.2d 505 (W.D.Pa.2010)                           55

*Farina v. Branford Bd. of Educ.*, 3:09-CV-49 JCH, 2010 WL 3829160                      18
    (D. Conn. Sept. 23, 2010) aff'd, 458 F. App'x 13 (2d Cir. 2011)

*Gaul v. Lucent Technologies 34 Inc.*, 134 F.3d 576 (3d Cir. 1998)                     2, 6

*Grosso v. UPMC*, 857 F. Supp. 2d 517 (W.D. Pa. 2012)                                54, 55

*Howard v. Pennsylvania Dep't of Pub. Welfare*, CIV.A. 11-1938,                       6, 7, 8,
    2013 WL 102662 (E.D. Pa. Jan. 9, 2013)                                       22, 23

*In re Japanese Electronic Products Antitrust Litigation*,                               5
    723 F.2d 238 (1983)

*Jeffrey v. Ashcroft*, 285 F. Supp. 2d 583 (M.D. Pa. 2003)                              33

*Kravits v. Shinseki*, 2012 WL 604169 (W.D. Pa. Feb. 24, 2012)                        7, 23

*Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731 (5th Cir.1999)                            40

*Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266 (3d Cir. 2012)                         29, 30

*Maresca v. Blue Ridge Commc'ns*, 363 F. App'x 882 (3d Cir. 2010)                       30

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92 (2d Cir.2009)                    37

*McClean v. Case Corp., Inc.*, 314 F. Supp. 2d 911 (D.N.D. 2004)                      39, 58

*McDonough v. Donahoe*, 673 F.3d 41 (1st Cir. 2012)                                   31, 32

*McEwen v. UPMC Shadyside Presbyterian Hosp.*,                                      34, 39, 52
    2:09-CV-1181, 2010 WL 4879195 (W.D. Pa. Nov. 23, 2010)

*Mills v. Temple Univ.*, CIV.A. 10–4324, 2012 WL 1122888    7, 25, 26,
    (E.D.Pa. Apr.3, 2012)    27, 40, 53

*Moore v. Nissan N. Am., Inc.*, 3:10-CV-569-DPJ-FKB,    28, 34, 36,
    2012 WL 2608792  (S.D. Miss. July 5, 2012)    37, 40

*Poper v. SCA Americas, Inc.*, CIV.A. 10-3201, 2012 WL 3288111    9, 28, 29
    (E.D. Pa. Aug. 13, 2012), appeal dismissed (Feb. 20, 2013)

*Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678 (5th Cir.1996)    37

*Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir.2001)    33

*Solomon v. Sch. Dist. of Philadelphia*, CIV.A. 10–3221,    7
    2012 WL 831959 (E.D.Pa. Mar.12, 2012)

*Stadtmiller v. UPMC Health Plan, Inc.*, 491 F. App'x 334 (3d Cir. 2012)    53, 54

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999)    40

*Troeger v. Ellenville Central School District*, 523 Fed. Appx. 848    18
    (2nd Cir. 2013)

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)    37

*Wehrley v. Am. Family Mut. Ins. Co.*, 513 F. App'x 733    30-31
    (10th Cir. 2013)

*Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 7513    8, 39
    (3d Cir.2004)

## **RULES**

Fed. R. Civ. P. 56.    4

## STATUTES AND REGULATIONS

29 C.F.R. pt. 1630, app.                                    36

29 C.F.R. § 1630.2                          8, 23, 25, 28, 33, 55

42 U.S.C. § 12102                                      7, 8, 23

42 U.S.C. § 12111                                          55

42 U.S.C. § 12112                                     6, 7, 37

## OTHER PUBLICATIONS

Technical Assistance Manual on the Employment Provisions      37, 50, 51,
        of the Americans with Disabilities Act,                  52, 58
        available online at http://askjan.org/links/ADAtam1.html

**BRIEF IN OPPOSITION OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Plaintiff, Candy S. Orner ("Ms. Orner"), by and through her attorneys, McCarthy Weisberg Cummings, P.C., submits this Brief in Opposition of Defendant's Motion for Summary Judgment, as follows:

The record established in this case clearly demonstrates that, at a minimum, material issues of fact exist with respect to all aspects of Ms. Orner's claim against National Beef Packing Company, LLC ("National Beef") for violations of the Americans with Disabilities Act of 1990, as Amended ("ADAAA"), and that National Beef in not entitled to summary judgment. In fact, with respect to certain elements of Ms. Orner's claim, Ms. Orner suggests that this Honorable Court should properly find in Ms. Orner's favor as a matter of law. The record clearly establishes that, at a minimum, material issues of fact exist with respect to whether Ms. Orner is disabled, applying the relaxed standards of the ADAAA. National Beef was aware of Ms. Orner's disability, and when Ms. Orner approached National Beef requesting a reasonable accommodation to return to work, her request was immediately denied. Despite Ms. Orner's best efforts to pursue returning to work, her efforts were continually rebuffed by her employer. National Beef failed to engage in the interactive process required by the ADAAA, and failed to suggest alternate accommodations, even through similar accommodations had been provided to other workers.

## I.    PROCEDURAL HISTORY

Plaintiff does not dispute the Procedure History outlined in Defendant's Brief (Doc. 27), with the exception of National Beef's assertion that there is not a genuine issue of material fact and National Beef is entitled to summary judgment as a matter of law.   Plaintiff now files this Brief in Opposition of Defendant's Motion for Summary Judgment, concurrently with her Response to Statement of Undisputed Material Facts.

## II.    PRELIMINARY STATEMENT

"Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on a disability."   *Gaul v. Lucent Technologies 34 Inc.*, 134 F.3d 576, 579 (3d Cir. 1998).   "In 2008, Congress passed the ADA Amendments Act ("ADAAA"), which substantially modified the terms of the ADA 'to make it easier for people with disabilities to obtain protection' under the statute."   *Canfield v. Movie Tavern, Inc.*, 13-CV-03484, 2013 WL 6506320 (E.D. Pa. Dec. 12, 2013).   In this case, National Beef failed to meet its responsibilities as an employer by violating Ms. Orner's rights under the ADA.

Ms. Orner began working for National Beef on or about February 28, 2005 as a Tray Packer.   (FACTS, ¶2)   Ms. Orner worked various positions while at National Beef, and last held the position of Tray Packer.   (FACTS, ¶3)   The Tray

Packer position required employees to grab a Styrofoam tray, like the ones commonly seen in grocery stores, from above the packing lines, and place cuts of meat on the tray as the meat comes down the conveyor belt in front of the employee and then return the tray with the meat on it to a different conveyor belt so it could continue to be packaged by others further down the line.  (FACTS, ¶4)

Ms. Orner had a long history of back problems and treatment during her employment with National Beef, leading up to surgery on December 16, 2011. (FACTS, ¶¶21, 27)  Prior to having surgery, Ms. Orner notified National Beef that she would be having back surgery and would require time off work, and National Beef approved her request for time off.  (FACTS, ¶26)  Ms. Orner underwent a surgical procedure called a lumbar laminectomy with discectomy L5-S1 on December 16, 2011 performed by Dr. Rajjoub with Lycoming Neurosurgical Associates.  (FACTS, ¶27)  Dr. Rajjoub provided National Beef with a note dated December 20, 2011 regarding Ms. Orner's surgery and stating that "Candy had surgery by Dr. Rajjoub on 12-16-11 FOA Lumbar Laminectomy.  She will be off from work for 4-6 weeks."  (FACTS, ¶28)

On February 20, 2012, a little over two months removed from her surgery, Ms. Orner attempted to return to work with a note releasing her to work, however she was not permitted to return.  (FACTS, ¶47)  As a result of requests from National Beef, Ms. Orner attempted to return to work on February 23, 2012, with a

note from her doctor advising that she would need an accommodation to return to work consisting of a sitting device which she could use from time to time throughout the day to decrease her discomfort.  (FACTS, ¶52)  In violation of the ADAAA, National Beef refused to accommodate Ms. Orner by providing Ms. Orner's requested accommodation and failed to suggest an alternative, resulting in Ms. Orner's ultimate termination from National Beef.  (FACTS, ¶¶3, 94, 115)

## III.   STATEMENTS OF MATERIAL FACTS

Plaintiff respectfully refers this Honorable Court to her Counter Statement to Defendant's Statement of Material and Undisputed Facts, which is being filed contemporaneously with this brief and incorporates the same herein by reference.

## IV.   STATEMENT OF QUESTIONS INVOLVED

A.    Does Ms. Orner's claim of "Discrimination and Failure to Provide Reasonable Accommodation Pursuant to the Americans With Disabilities Act fail as a matter of law?

**Suggested Answer:      No**

## V.   STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  This procedural

mechanism and the authorities interpreting and applying it have set a high standard to determine when granting a summary judgment motion is appropriate.

The moving party always bears the initial responsibility of informing the district court of the reason for its motion, as well as identifying those portions of evidentiary record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2552, 91 L.Ed. 2d 265 (1986). In response to a motion for summary judgment, the nonmoving party must then show that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). "If, however, there is any evidence in the record from any source from which a reasonable inference in the respondent's favor may be drawn, the moving party simply cannot obtain a summary judgment." *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 258 (1983) reversed on other grounds *sub nom.*

When deciding whether granting summary judgment is proper, the district court must accept and believe the evidence of the non-moving party as true, and must not weigh or consider the credibility of witnesses. *Anderson,* 477 U.S. at 248-52. Any and all doubts regarding the evidence must be resolved in favor of the non-moving party on summary judgment. *Eastman Kodak Co. v. Image Technological Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2076 (1992). If the non-moving party's evidence contradicts that of the moving party, then the non-

movant's evidence must be taken as true. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262 (1993).

## VI.   LEGAL ARGUMENT

**National Beef discriminated against Ms. Orner and failed to provide Ms. Orner with a reasonable accommodation pursuant to the Americans with Disabilities Act, as Amended**

The ADAAA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a), *Howard v. Pennsylvania Dep't of Pub. Welfare*, CIV.A. 11-1938, 2013 WL 102662 (E.D. Pa. Jan. 9, 2013).

To make out a prima facie case of discrimination under the ADAAA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul,* 134 F.3d at 580.  "An employer who does 'not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability' discriminates 'on the basis of disability.'   42 U.S.C. §

12112(b)(5)(A)."   *Howard*, CIV.A. 11-1938, 2013 WL 102662.   "'Failure to accommodate' includes both refusing to provide an employee with a proposed reasonable accommodation and failing to engage in an interactive process after the employee requested an accommodation."   *Id.*, citing *Solomon v. Sch. Dist. of Philadelphia,* CIV.A. 10–3221, 2012 WL 831959, at *10 (E.D.Pa. Mar.12, 2012).

### A.   Ms. Orner is a disabled person within the meaning of the ADAAA

#### 1.   Definition of "disabled"

"An individual qualifies as 'disabled' under the ADA if he (1) has a physical or mental impairment that substantially limits one or more of his major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). '[W]hether an individual is substantially limited as to a major life activity is a question of fact.' *Mills v. Temple Univ.,* CIV.A. 10–4324, 2012 WL 1122888, at *7 (E.D.Pa. Apr.3, 2012)."   *Howard*, CIV.A. 11-1938, 2013 WL 102662.

#### 2.   Definition of "substantially limits"

In *Howard*, the court addressed the meaning of "substantially limits," as follows:

> In determining whether [an individual] is substantially limited in performing a major life activity, . . . "[t]he ADAAA seeks to broaden the scope of disabilities covered by the ADA." *Kravits* [*v. Shinseki*], 2012 WL 604169 [(W.D. Pa. Feb. 24, 2012)], at *5; *see also* 42 U.S.C. § 12102(4)(A) (instructing that the "**[t]he definition of disability . . . shall be construed in favor of broad coverage**").

Reflecting this purpose, the accompanying EEOC regulations provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. **'Substantially limits' is not meant to be a demanding standard.**" 29 C.F.R. § 1630.2(j)(1)(i). "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. **[T]he threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.**" 29 C.F.R. § 1630.2(j)(1)(iii). Ultimately, "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

*Howard v. Pennsylvania Dep't of Pub. Welfare*, CIV.A. 11-1938, 2013 WL 102662 (E.D. Pa. Jan. 9, 2013) (Emphasis added). Although an individual claiming disability discrimination still bears the burden of establishing a prima facie case in order to withstand summary judgment, "it is a relatively low burden after the 2008 amendments." *Bush v. Donahoe*, 964 F. Supp. 2d 401, 416 (W.D. Pa. 2013).

"'[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.' 42 U.S.C. § 12102(2). Generally, the question of whether a plaintiff is substantially limited in performing a major life activity is one of fact. See *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 763 (3d Cir.2004). Consequently, the key question is whether the plaintiff has put

forth sufficient evidence such that a finder of fact could determine that he was substantially limited with respect to a major life activity." *Poper v. SCA Americas, Inc.*, CIV.A. 10-3201, 2012 WL 3288111 (E.D. Pa. Aug. 13, 2012), appeal dismissed (Feb. 20, 2013).

Prior to her surgery, Ms. Orner had a long history of back problems and treatment during her employment with National Beef.  (FACTS, ¶21)  On June 8, 2005, Ms. Orner had an x-ray taken of her lumbosacral spine, which indicated osteoarthritic changes at L4-L5 and mild osteoarthritic changes at L5-S1. (FACTS, ¶21)

On October 29, 2007, Ms. Orner was seen in the Emergency Department of Evangelical Community Hospital for complaints of worsening low back pain and pain radiating down her left leg.  Her appearance was described as uncomfortable. Her pain was varying in intensity and it was hard to move around.  She presented with a decreased range of motion, pain and tenderness.  Ms. Orner underwent x-rays of the lumbar spine that revealed degenerative disc disease at L4-L5.  She was treated and released at that time and was provided with a prescription for Vicodin. (FACTS, ¶21)

On October 31, 2007, Ms. Orner had a follow up visit with Family Practice Center, PC, regarding her back pain, the onset of which occurred when she was doing laundry.  She continued to be prescribed Vicodin.  (FACTS, ¶21)

On October 14, 2008, Ms. Orner had a follow up visit with Family Practice Center, PC, regarding her back pain, and indicated she had been in severe pain. The pain was aggravated by standing and by coughing. She was in severe pain and hurt with all movement. She was prescribed Vicodin and Flexeril as needed for muscle spasm. (FACTS, ¶21)

On October 28, 2008, Ms. Orner had a follow up visit with Family Practice Center, PC, regarding her lower back and tailbone pain. Ms. Orner indicated that she had lifted some groceries on Saturday and woke up Sunday and could barely walk. She rated her pain as severe with difficulty lifting and walking. She appeared uncomfortable. She continued to be prescribed Vicodin and Flexeril. (FACTS, ¶21)

On October 29, 2008, Ms. Orner underwent a Physical Therapy Evaluation at Evangelical Community Hospital for lower back pain. Ms. Orner indicated increased symptoms with lifting, vacuuming, prolonged sitting and standing. Physical Therapy was continued through November 12, 2008. (FACTS, ¶21)

On September 10, 2009, Ms. Orner consulted with Family Practice Center, PC regarding neck, shoulder and upper back pain. She reported waking up at night with throbbing pain in her neck, arms and hands, and waking up in the morning with bilateral hand numbness. She reported taking ibuprofen 2 tablets with slight relief. (FACTS, ¶21)

On September 28, 2009, Ms. Orner consulted with Family Practice Center, PC regarding lower back pain that radiated down her left leg.  She indicated that the pain started following a cough, and had increased pain with flexion.  She was advised to increase ibuprofen to 800 mg three times a day, put ice on the sciatica area and some heat on the back.  She was prescribed Flexeril and Vicodin. (FACTS, ¶21)

On September 29, 2009, Ms. Orner underwent a Physical Therapy Evaluation at Evangelical Community Hospital for backache and radiculitis.  She reported that her symptoms increased with sitting, standing, crossing her legs and rolling in bed.  Physical Therapy was continued through October 21, 2009. (FACTS, ¶21)

On October 5, 2009, Ms. Orner followed up with Family Practice Center, PC regarding lower back pain.  At that time, she was attending physical therapy.  Her Vicodin prescription was continued.  (FACTS, ¶21)

On March 10, 2010, Ms. Orner consulted with Family Practice Center, PC complaining of bi-lateral foot and leg pain when she was working.  She described an achy pain constantly all the way down her legs, which was sharp at times and increased with lifting dog food or standing too long.  At night, Ms. Orner would get a feeling of "bugs crawling" in her left leg.  She reported that occasionally, her knees would give out and she would lose her balance.  She was advised to take

Aleve twice a day, continued her prescription for Vicodin and was prescribed Mirapex to take 1-3 hours before bedtime.  (FACTS, ¶21)  An x-ray of Ms. Orner's L-S Spine on March 10, 2010, indicated moderate degenerative disc changes L4-L5, and mild to moderate L4-L5 and  L5-S1 disc space narrowing.  (FACTS, ¶21)

On March 24, 2010, Ms. Orner consulted with Family Practice Center, PC for a two week follow up on her bi-lateral leg pain.  She indicated that her back pain was interfering with her sleep.  At that time, Ms. Orner was going through physical therapy.   She was advised to continue with Aleve, and given a course of prednisone for seven days, as well as maintaining her prescription for Mirapex. (FACTS, ¶21)

In March and April 2010, Ms. Orner attended physical therapy at Evangelical Community Hospital to deal with her back and leg pain.  (FACTS, ¶21)

A lumbar spine MRI performed on March 29, 2010, was interpreted as revealing multilevel disc desiccation, degenerative disc changes, circumferential end plate spondylosis, annular bulging, facet arthrosis, mild central canal stenosis, left posterior disc herniation/protrusion at L4-L5 and disc desiccation, right posterior paramedian disc herniation/protrusion with neural impingement and canal stenosis at L5-S1.  (FACTS, ¶21)

Ms. Orner next visited John P. Furia, M.D., who initially evaluated her on April 8, 2010, at which time she presented with complaints of back pain radiating to both lower extremities, which had been more insistent over the prior few months. She was referred to Dr. Lin to discuss surgical intervention and lumbar epidural injections.  (FACTS, ¶21)

On April 21, 2010, Ms. Orner consulted with Paul S. Lin, M.D. and discussed the options of living with her back problems versus having a two-level anterior fusion.  Dr. Lin opined that the likelihood of Ms. Orner avoiding surgery was only 50/50.  (FACTS, ¶21)

On June 25, 2010 and June 28, 2010, Ms. Orner consulted with Family Practice Center, PC regarding lower back pain that was shooting down her left leg. She indicated that the pain in her leg was almost constant.   Her prescriptions included Vicodin, Flexeril, Prednisone and Diclofenac.  (FACTS, ¶21)

On July 2, 2010, Ms. Orner consulted with Dr. Lin regarding an increase in discomfort.  She had been experiencing left leg pain for approximately one week, which got worse after a coughing spell.  Dr. Lin recommended a selective nerve root injection of the L5 root.  (FACTS, ¶21)

On July 12, 2010, a left L5 transforaminal epidural steroid injection was performed.  (FACTS, ¶21)

On July 30, 2010, Ms. Orner consulted with Dr. Lin regarding left leg pain and right leg discomfort.  Dr. Lin recommended a caudal block.  (FACTS, ¶21)

On August 20, 2010, a lumbar epidural injection was performed.  (FACTS, ¶21)

On September 24, 2010, Ms. Orner had a follow up consultation with Dr. Lin.  At that time, the epidural block had alleviated a lot of Ms. Orner's pain.  (FACTS, ¶21)

On May 18, 2011, Ms. Orner consulted with Dr. Lin regarding persistent complaints of low back and bi-lateral leg pain.  She reported being quite uncomfortable and having a hard time working.  She also complained of neck discomfort, headache pain, and shooting pain down her right arm.  Dr. Lin ordered an MRI at that time.  (FACTS, ¶21)

A cervical spine MRI performed on May 24, 2011, was interpreted as revealing small noncompressive right paramedian disc protrusion at C2-3, small broad-based osteophyte disc complexes at C3-4 and C4-5, a broad-based disc protrusion at C5-6, annular bulging at C6-7, facet arthrosis with noncompressive left foraminal narrowing at T1-2 and a large T2 vertebral body hemangioma.  (FACTS, ¶21)

On May 27, 2011, Ms. Orner had another follow up consultation with Dr. Lin.  Dr. Lin did not recommend surgery with respect to Ms. Orner's complaint of neck pain.  (FACTS, ¶21)

On November 21, 2011, Ms. Orner was seen by Rodwan Rajjoub, M.D. This was a second opinion for low back and bilateral leg pain.  She was noted to have failed physical therapy and injections and had urinary incontinence with sneezing or coughing.  Dr. Rajjoub diagnosed a large extruded HNP L5-S1 central to right, lumbar radiculopathy, severe degenerative lumbar disc disease L4-5, and small HNP L4-5 left foraminal.   Surgical intervention was recommended. (FACTS, ¶21)

In an "Attending Physician Statement" dated November 30, 2011, Dr. Rajjoub advised National Beef that Ms. Orner was suffering from symptoms of low back and right leg pain, and would be undergoing surgery, namely a lumbar laminectory L5-S1 right.  Dr. Rajjoub indicated the recovery period would be 4 - 6 weeks after surgery, during which Ms. Orner would not be able to work.  Dr. Rajjoub indicated Ms. Orner's then current restrictions were "No bending, lifting, twisting [at] waist.  No extended sitting or standing."  (FACTS, ¶127)

Prior to her back surgery, Ms. Orner stated that she had "[l]ower back pain, legs and feet constantly tingly like they were asleep, severe pain in my back." (FACTS, ¶20)   Additionally, prior to her surgery, Ms. Orner was having pain all

the time and her legs and feet were numb.  (FACTS, ¶121)  In 2011, Although Ms. Orner regularly completed activities such as going out to eat, shopping, gardening, cleaning the house, vacuuming and mopping, she was unable able to complete activities without pain.  (FACTS, ¶25)

Prior to having surgery, Ms. Orner notified National Beef that she would be having back surgery and would require time off work, and she understood that National Beef approved her request for time off.  (FACTS, ¶26)  Ms. Orner underwent a surgical procedure called a lumbar laminectomy with discectomy L5-S1 on December 16, 2011 performed by Dr. Rajjoub with Lycoming Neurosurgical Associates.  (FACTS, ¶27)  Dr. Rajjoub, the surgeon who performed Ms. Orner's back surgery, provided National Beef with a note dated December 20, 2011, regarding Ms. Orner's surgery and stating that "Candy had surgery by Dr. Rajjoub on 12-16-11 FOA Lumbar Laminectomy.  She will be off from work for 4-6 weeks."  (FACTS, ¶28)  During her six week recovery period, Ms. Orner was restricted from bending and twisting at the waist, lifting anything over a gallon of milk, sitting in a straight back chair and driving in vehicles for a long period of time. (FACTS, ¶30)

On January 23, 2012, six weeks and three days after her surgery, Ms. Orner was examined by Dr. Rajjoub.  On that date, Ms. Orner reported having low back pain that was worse with being in any position for too long, especially riding in a

car, as well as having trouble sleeping at night.   Aggravating factors were identified as activity, walking, sitting and standing.  (FACTS, ¶31)  At that visit, Ms. Orner reported back pain on a scale of 3 of 10 average and 6 of 10 at its worst. The report indicated that physical activity was decreased secondary to pain. (FACTS, ¶41)  Ms. Orner was advised to be careful lifting and bending.  (FACTS, ¶31)

Ms. Orner testified that she was able to resume household chores, gardening and other activities, but had to take her time doing them.  Ms. Orner also testified that her back has affected her ability to step in and out of the shower, get out of bed, dress herself and put on her sneaker or boots, sit for more than an hour, sleep (due to pain and her legs feeling like they have bugs crawling on them due to pinched nerves in her back), stand for more than two hours, stoop for five minutes, and walk for more than 500 feet at a time before she needs to stop and rest.  Ms. Orner's sleep is interrupted every night, and she can only get four to five hours of sleep per night with the aid of Amitriptyline, which makes her sleepy.  Timothy R. Stafford, who lives with Ms. Orner, testified that Ms. Orner's back condition has affected her ability to lift items around the house, get dressed without help, get in and out of the car without assistance, stand for a long period of time, and tend to her garden.  Mr. Stafford testified that Ms. Orner's back pain has also affected Ms. Orner's ability to sleep and to get out of bed.  (FACTS, ¶31)  Ms. Orner was

advised to use her discretion when lifting, and she estimates a personal limitation of approximately 20 pounds.[1]  (FACTS, ¶35)

Ms. Orner attended numerous post-operative follow up visits following her January 23, 2012 consultation with Dr. Rajjoub.  (FACTS, ¶43)

Ms. Orner consulted with Family Practice Center, PC regarding her disc disease and herniation on January 27, 2012.  Ms. Orner indicated that if she cooks for a half hour or runs the vacuum she is "down for awhile."  She indicated that although she was released to work by Dr. Rajjoub on February 20, 2012, she was concerned with respect to lifting and because she was advised she would need to be very careful in everything she does for her whole life due to her herniation in L3/L4.  Her prescriptions included Vicodin and Prednisone.  (FACTS, ¶43)

---

[1]     EEOC Regulations specifically note that an individual that suffers from an impairment that results in a lifting restriction, such as Ms. Orner's, is substantially limited in the major life activity of lifting.  29 CFR § 1630.2(j)(1)(ix) (App.)  (see *Canfield*, 13-CV-03484, 2013 WL 6506320, "[I]f an individual has a back impairment that results in a 20–pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability.")  (see also *Farina v. Branford Bd. of Educ.*, 3:09-CV-49 JCH, 2010 WL 3829160 (D. Conn. Sept. 23, 2010) aff'd, 458 F. App'x 13 (2d Cir. 2011), "in light of recent amendments to the ADA—lowering the threshold requirement to establish a 'disability' and including 'lifting' as a 'major life activity,' see 42 U.S.C. § 12102(2)(A); see generally ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (codified in scattered sections of U.S.C.) - it is possible that even a relatively minor lifting restriction could qualify as a disability within the statute.")

National Beef cites to *Troeger v. Ellenville Central School District*, 523 Fed. Appx. 848 (2nd Cir. 2013), for the proposition that "an individual is not 'disabled' merely because he cannot lift heavier objects weighing, for instance, around twenty pounds."  However, *Troeger* is inapplicable to the case at issue, because it was decided using the pre-2009 ADA amendments; rather, Troeger's claims related to actions taken by the school district between November 2007 and the end of the 2007-08 school year.  *Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x 848, 852 (2d Cir. 2013)

Ms. Orner next consulted with Family Medical Center, PC, regarding her back pain on February 10, 2012.  She indicated that post-surgical symptoms had worsened and rated as severe.  She indicated that her pain was worse while at rest and subsided with movement, and was moderately alleviated by Vicodin.  She indicated difficulty with activities of daily life (ADL's).  She was advised to follow up in 1-2 weeks if no better and consult with a neurosurgeon for pain management. Her prescription for Vicodin was discontinued, and she was prescribed Tramadol and Ibuprofen.  (FACTS, ¶43)

Ms. Orner next consulted with Family Medical Center, PC, regarding her back pain and cervical pain on February 21, 2012.  She indicated that at that time her pain had lessened somewhat, but would be a "10/10" without pain medication. She complained of pain in her lower back and neck, as well as unrelenting headaches which had lasted over a month.  She advised that she had not been permitted to return to work.  She was referred to Dr. Askari for the neurological sequelae of her headaches as well as her cervical spine.   At that visit, Dr. Companion indicated that Ms. Orner would function better if she could intermittently sit as well as stand at work.    (FACTS, ¶43)  Dr. Companion indicated to Ms. Orner that he would give her a note indicating that if Ms. Orner needed to sit she should be able to, in order to relieve the pressure and pain in her back.  Dr. Companion suggested the note, and Ms. Orner agreed.  (FACTS, ¶122)

Ms. Orner advised Dr. Companion that she normally performed the Tray Packer job while standing.  (FACTS, ¶123)  Ms. Orner advised Dr. Companion about the requirements of her job.  (FACTS, ¶124)  Dr. Companion never advised Ms. Orner any specific length of time that he thought she had to sit during the day; rather, it was at Ms. Orner's discretion. (FACTS, ¶125)  She continued to be prescribed Tramadol and Ibuprofen.  (FACTS, ¶43)

On March 8, 2012, Ms. Orner consulted with Hasan Askari, M.D., with follow up visits on March 14, 2012 and March 15, 2012, regarding her persistent headaches.  Impressions were of migraine and paresthesias.  Amitriptyline was started at that time.  (FACTS, ¶43)

A brain MRI performed on March 30, 2012 was interpreted as revealing a few punctate foci of FLAIR signal hyperintensity in the bifrontal white matter interpreted as representing a nonspecific finding.  (FACTS, ¶86)

On April 17, 2012, Ms. Orner consulted with Family Medical Center, PC, regarding her back pain.  She reported a new onset of back pain with radiation down her right leg posteriorly to her heel occurring for the past ten days.  Pain was worsening and described as moderate.  Ms. Orner indicated that nothing made the pain better, and it worsened with exercise and post-static.  Movement was described as aggravating and rest as alleviating.  Ms. Orner indicated that the pain affected her activities of daily living.  Doctor notes indicated that Ms. Orner

dragged her right leg and complained of pain in her leg with ambulation.  At that time, Ms. Orner was seeking a new excuse to return to work because National Beef had rejected the prior doctor notes.  She continued to be prescribed Tramadol, Ibuprofen and Amitriptyline.  (FACTS, ¶43)

An EMG/NCV report from Hassan Askari, M.D. dated August 7, 2012 was interpreted as revealing  mild early and chronic denervation changes in the left L 4-5 and S1 paraspinal levels consistent with early radicular findings involving the low back.  (FACTS, ¶87)

An MRI of the lumbar spine performed on August 29, 2012 was interpreted as revealing postoperative changes at L5-S1 with evidence of perineural scarring especially in the region of the right lateral recess, a collection in the midline and to the right suggesting recurrent disc extrusion and degenerative changes at L4-L5 similar to the prior study.  (FACTS, ¶88)

On September 17, 2012, Ms. Orner consulted with Dr. Rajjoub.  The evaluation report indicates that Ms. Orner reported, "that she has a shooting pain along the posterior aspect of bilateral legs.  Numbness/tingling is present in bilateral feet."  Ms. Orner reported an average pain level of 7 of 10 with a worst pain level reaching 10 of 10.  The pain was constant and worse at times.  The pain was aggravated by walking, sitting and standing.  (FACTS, ¶44)

On November 8, 2012 and December 13, 2012, Ms. Orner underwent lumbar epidural injections.  (FACTS, ¶89)

On April 8, 2013, Ms. Orner consulted with Dr. Rajjoub.  The evaluation report indicates that Ms. Orner reported that she "continues to have pain in her low back.  She reports that she has a shooting pain along the posterior aspect of bilateral legs, left more than right.  Numbness/tingling is present in bilateral feet.  She received epidural injections in December 2012, with no relief.  It is occasionally painful to sneeze/cough . . . It is painful to walk, she can walk about 100 feet before the pain is too intense."  Ms. Orner reported an average pain level of 7 of 10 with a worst pain level reaching 10 of 10.  The pain was constant and worse at times.  The pain was aggravated by walking, sitting and standing.  (FACTS, ¶45)

Ms. Orner was under the treatment of Dr. Askari as detailed in office notes through August 20, 2013.  She was treated with Amitriptyline that helped her headaches but not her back pain.  Her headaches remained controlled as detailed in office notes through August 20, 2013 with persistent back pain.  (FACTS, ¶89)

 Since the ADA amendments went into effect, Courts have routinely refused to grant Defendant's motions for summary judgment in cases very similar to Ms. Orner's.  In *Howard v. Pennsylvania Dep't of Pub. Welfare*, the court held that:

> Howard has produced evidence from which a reasonable jury
> could conclude her fibromyalgia substantially limits her ability to

walk, sleep, and perform manual tasks as compared to most people in the general population.   Howard testified that she has difficulty walking when her ankles and hips are "flaring."   In an affidavit, Howard's husband similarly stated that Howard is limited in her ability to walk for extended periods of time, particularly in "wet, cool weather." . . . Also in an affidavit, Howard averred that she suffers from insomnia, which she identified as a symptom of her fibromyalgia.   Again, Howard's husband indicated the same.   Finally, Howard's husband indicated that, during severe "flare-ups," Howard is substantially limited in her ability to "perform household chores and routine tasks of daily living, such as shopping, driving, or leaving the house to run errands."   These assertions are supported by voluminous medical records, which indicate that Howard's ability to walk is limited in rainy weather, that her ability to perform activities of daily life, such as household chores, is limited, and that she suffers from persistent "sleep disturbances," which are "consistent with fibromyalgia,"   That Howard regularly experiences pain while performing these activities bolsters my conclusion. *See* 29 C.F.R. § 1630.2(j)(4)(ii) (**instructing courts to consider the "pain experienced when performing a major life activity**").   Viewing these facts in Howard's favor, and **in light of the "less searching analysis called for by the ADAAA**," *Kravits,* 2012 WL 604169, at *6,  I conclude that Howard has presented evidence from which a reasonable jury could conclude she is substantially limited as to a major life activity.

The only discernible argument Defendants make to the contrary is a suggestion that Howard does not suffer from a disability because her symptoms "wax and wane." . . . The ADAAA plainly forecloses this line of reasoning. 42 U.S.C. § 12102(4)(D) ("**An impairment is episodic or in remission is a disability if it would substantially limit a major life activity when active.**") Accordingly, I need not address Defendants' argument further.

*Howard v. Pennsylvania Dep't of Pub. Welfare*, CIV.A. 11-1938, 2013 WL 102662

(E.D. Pa. Jan. 9, 2013)  (Emphasis added).   Similar to the plaintiff in *Howard*, Ms.

Orner is limited in her abilities to walk and sleep.   She is able to perform

household chores, but is limited by pain, which affects many of her activities of daily living.   Although Ms. Orner's symptoms may wax and wane, as cited, the ADAAA "plainly forecloses this line of reasoning," and Ms. Orner's symptoms, when most active, are clearly debilitating.

In *Cohen v. CHLN, Inc.*, the court refused to grant defendant's motion for summary judgment, holding that:

> In addition to Plaintiff's own testimony, he has submitted a letter from his doctor dated June 17, 2009—over two months before Plaintiff's termination—in which the doctor diagnosed him with lumbar radiculopathy with spinal and foraminal stenosis and recommended a series of back injections. The letter states: "[Plaintiff's] pain is aggravated by walking and lying down.  He can only walk ten to twenty yards at a time and then he has to stop and rest.  He gets some relief when he applies ice to his leg or when he sits.  He finds it very difficult to sleep at night in that he is constantly tossing and turning in order to try and find a more comfortable position.  He walks with the assistance of a cane."  After multiple injections failed to resolve his back and leg issues, his doctor recommended surgery requiring weeks of recovery.   Plaintiff continued to experience severe pain and limited mobility until he underwent surgery in December of 2009.   Plaintiff's deposition testimony indicates that he still struggles with these issues.

> Defendants argue that Plaintiff's condition was of too short a duration to qualify as a disability.  The Court disagrees.  As discussed above, the **ADAAA mandates no strict durational requirement for plaintiffs alleging an actual disability**.  Even if it did, Plaintiff's evidence could allow a jury to find that his condition was by no means fleeting.  Plaintiff's back and leg issues began four months before his termination and were not resolved by the injections recommended by Plaintiff's doctor.  At the time of the termination, Plaintiff's doctor had suggested the possibility of surgery requiring extensive recovery time, with no indication that Plaintiff's condition would be resolved permanently.  **Such a severe, ongoing impairment stands in distinct**

> **contrast to those cited by the EEOC as merely minor and temporary, such as the common cold or flu**. 29 C.F.R. pt. 1630.2, app. § 1630.2(l).

*Cohen v. CHLN, Inc.*, CIV.A. 10-00514, 2011 WL 2713737 (E.D. Pa. July 13, 2011) (Emphasis added).   As with the plaintiff in *Cohen*, Ms. Orner suffered significant back problems for an extended period of time, and underwent multiple treatment efforts without significant and permanent relief.   At various times, her pain was reported to be aggravated by many of the activities of daily living, such as walking and sleeping.   Similar to *Cohen*, Ms. Orner's doctors have suggested that her condition would likely never be resolved permanently.

The District Court for the Eastern District of Pennsylvania also refused to grant the defendant's motion for summary judgment in *Mills v. Temple University*. While typing at her desk one day, Mills was struck in the back by a co-worker and flung forward.   *Mills*, 869 F. Supp. 2d at 614.   While being treated for her back injury, Mills continued to work without any doctor-imposed, work-related restrictions.   "Nevertheless, Mills experienced pain in her back while working and had difficulty lifting and filing patient charts."   *Id.* at 615.   "Outside of work, Mills continued to engage in daily activities such as driving, caring for her herself and her daughter, and shopping.   However, Mills struggled with these daily activities, which she found exhausting.   Mills enrolled in a ballet class in the fall of 2008, but found that she could no longer exercise to the extent she had previously been

accustomed." *Id.* Mills' doctor noted that she had disc "desiccation with disc bulging eccentric at C2–3 and to [the] right at C5–6." *Id.* at 616. Mills was treated for approximately six months, and she received bi-monthly epidural injections for her back pain. *Id.*

The court rejected defendant's arguments that Mills was not disabled under the ADAAA, holding that,

> Temple points to Mills's testimony that she has continued to perform day-to-day activities (i.e., caring for herself and her daughter, driving, shopping, attending classes, and commuting on the bus or train) since being injured, that she has not treated with a healthcare professional since December 2009 or taken medication since that time, and that she worked without interruption until July 2009.

> However, these statements, when considered in context and in light of other evidence in the record, do not foreclose a finding that Mills was disabled. To begin, "the determination of whether a person was a 'qualified individual with a disability' for the purposes of an ADA claim is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made." *Bowers v. NCAA,* 475 F.3d 524, 535–536 (3d Cir.2007). In the period of time before Mills was placed on unpaid leave, her work was not "uninterrupted" as Temple suggests. Rather, Mills took sick leave in order to attend doctors' appointments after her back injury in 2008, and took intermittent FMLA leave in 2009 in order to recuperate from epidural injections. Furthermore, Mills received help with filing from her co-workers and interns. Mills testified that she stopped seeing a physician in December 2009 because she lost her health insurance after she was terminated by Temple. I will not hold this hardship against her. Moreover, Mills took various pain medications—Naprosyn, a muscle relaxer, and Motrin—following her injury. Finally, **although Mills continued to engage in daily activities and chores following her injury, she struggled to complete them,** and found small tasks such as brushing her daughter's hair to be painful and exhausting.

*Id.* at 621.  (Emphasis added)

The court went on to hold that, "Under the less restrictive standard of the ADAAA, I find that Mills has offered sufficient evidence to raise a genuine issue of fact as to whether she was disabled at the time she was removed from her position and placed on leave."  *Id.* at 622.  Ms. Orner is similar to the plaintiff in *Mills* because, although Ms. Orner was able to work for the most part notwithstanding her medical conditions, Ms. Orner treated extensively for most of her tenure at National Beef.  Furthermore, Ms. Orner struggled to complete daily activities and chores, as reflected in voluminous medical records.

In *Barlow v. Walgreen Co.*, the court also held that a plaintiff with similar impairments to Ms. Orner's was disabled under ADAAA.:

> Here, Plaintiff argues that she suffers from physical disabilities which limit one of her major life activities.  Specifically, she contends that her impairments of spinal stenosis, cervical disc disease, neural foraminal stenosis, and cervical radiculopathy, substantially limit her major life activity of the operation of her musculoskeletal system.
>
> Plaintiff's impairments all undisputedly affect her musculoskeletal function.  The fact that her disorders cause her to have great difficulty lifting even relatively light objects such as a gallon of milk, and that she has great difficulty crouching for more than short periods of time both testify to the seriousness of her musculoskeletal problems.  Her impairments put her at a disadvantage as compared to "most people in the general population," and certainly qualify as a significant restriction.  As the new regulations do not even require that the limitation be "significant or severe," taking Plaintiff's allegations as true, Plaintiff's impairments substantially limit her

musculoskeletal system; thus, Plaintiff qualifies as disabled under the ADAAA. See 29 CFR § 1630.2(i)(1)(ii), (j)(1)(ii).

*Barlow v. Walgreen Co.*, 8:11-CV-71-T-30EAJ, 2012 WL 868807 (M.D. Fla. Mar. 14, 2012).

In *Moore v. Nissan N. Am., Inc.*, the parties agreed that Moore was disabled for the purpose of the ADA. *Moore v. Nissan N. Am., Inc.*, 3:10-CV-569-DPJ-FKB, 2012 WL 2608792 (S.D. Miss. July 5, 2012), appeal dismissed (Nov. 19, 2012). The plaintiff in *Moore* had many similar characteristics to Ms. Orner. Moore's doctor stated that Moore "does have a disability which may keep him from standing, climbing, or operating heavy machinery for many hours at a time." *Id.* "Moore could stand for 2 hours intermittently; walk for 3 hours intermittently; could not climb but could twist/bend/stoop; could lift 10 pounds "frequently" and up to 50 pounds "occasionally"; and could work a "sedentary job" 6–8 hours/day. By June 2009, Parker noted that Moore's condition had not changed and therefore his 'deficits ... are permanent.'" *Id.*

National Beef cites several cases in its Brief in Support of its Motion for Summary Judgment to allegedly demonstrate that courts in the Third Circuit would not find Ms. Orner disabled; however, the cases cited by Defendant are easily distinguishable. In *Poper v. SCA Americas, Inc.*, the court granted defendant's motion for summary judgment. In *Poper*, the court found that while plaintiff Poper testified to an occasional limitation with his ability to brush his teeth, bend or lift

"more than 30 pounds without really feeling pain," and that he had occasional trouble walking, Poper never testified the specific dates associated with those limitations, and testified to not having any limitations due to his back problem while working for the defendant until mid-May 2009. The court then cited to the fact that despite collecting 550 pages of medical records in connection with the litigation, there was only one document that even mentioned Plaintiff's back pain in May 2009, that being Plaintiff's discharge documents from the emergency room dated May 7, 2009, following a car accident, in where there was a report of "general back pain," Furthermore, the court noted that a week later, when Plaintiff sought treatment at a hospital on May 15, 2009, Plaintiff reported that he had no pain in his back. *Poper*, CIV.A. 10-3201, 2012 WL 3288111. Quite to the contrary, Ms. Orner presents significant testimony of both herself and Mr. Stafford, as well as voluminous medical records over a significant period of time, both before and after her surgery, which substantiate both her pain and her physical limitations.

National Beef also cites to *Macfarlan v. Ivy Hill SNF, LLC*, for the proposition that "a temporary non-chronic impairment of short duration is not a disability" under the ADA. *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012). What National Beef fails to mention with respect to *Macfarlan* is that the plaintiff in that case suffered a stroke and was given temporary lifting

restrictions which were lifted after four months. *Id.* at 270, 274. Ms. Orner, on the other hand, was told that she would need to exercise caution and discretion while lifting for the foreseeable future. Ms. Orner continued to treat for symptoms of her disability and was given a restriction which was not temporary in nature with respect to needing to sit as required throughout the work day.

In *Maresca v. Blue Ridge Commc'ns*, cited to by National Beef, summary judgment was granted where (1) the Complaint was filed in June 2008, prior to the ADA amendments becoming effective, (2) the plaintiff "testified unequivocally that he did not have any physical problems or limitations as of April 2006 - the date of his termination - and that he was able to return to work at that time," and (3) there was no medical evidence in the record suggesting otherwise. *Maresca v. Blue Ridge Commc'ns*, 363 F. App'x 882, 884-885 (3d Cir. 2010). Ms. Orner's case not only was filed subsequent to the ADA amendments becoming effective on January 1, 2009, but Ms. Orner has never testified that she did not have any physical problems or limitations as of the date of her termination and/or the date National Beef refused to allow her to return to work, and her medical records and deposition testimony support her claims of physical problems and limitations.

Similarly, *Wehrley v. American Family Mut. Ins. Co.*, cited by National Beef, runs an inapplicable analysis of "disability" under the ADA because it applied the pre-2009 ADA amendment standards. *Wehrley v. Am. Family Mut. Ins.*

*Co.*, 513 F. App'x 733 (10th Cir. 2013)  ("We have held that the Amendments Act does not apply retroactively, so we must apply the law as it stood in 2008, when Defendant fired Plaintiff.")

In *Bush v. Donahoe*, cited by National Beef, summary judgment was granted against the plaintiff where the court held her impairment of less than seven months to not meet the disability prong of the ADA, finding that "Bush has failed to proffer any evidence, medical or otherwise, as to the severity of her impairment and/or its limitations." *Bush*, 964 F. Supp. 2d at 417, 420.  The court cited to the fact that Bush did not provide, "any evidence to show that she required any type of treatment for her sprained foot, other than an open-toed boot, or that she required the use of medication, nor has she provided any evidence to show her level of pain, or the effect, if any of her impairment on her activities of daily living.  She has not even identified the 'other daily activities' she claims were limited by her ankle/foot sprain." *Id.* at 421.  Ms. Orner, in contrast, demonstrated an impairment lasting from at least 2005 until the present.  She has supplied a significant medical history documenting her level of pain, medications prescribed and impairment on her activities of daily living.

Finally, National Beef cites to *McDonough v. Donahoe*, where plaintiff was not found to be disabled.  *McDonough v. Donahoe*, 673 F.3d 41 (1st Cir. 2012). However, in *McDonough*, the plaintiff was significantly more physically able than

Ms. Orner. *Id.* at 47-48.   Additionally, McDonough had been able to do her job satisfactorily with accommodations provided by her employer, including a four-hour work day, a stool to rest her knee on while she sorted mail, and a cart instead of a satchel to help her deliver the mail. *Id.* at 47. Ms. Orner, on the other hand, was never provided accommodations, as requested, to allow her to do her job subsequent to her surgery.

Without question, Ms. Orner's condition, at a minimum, raises a genuine issue of material fact as to whether she was disabled as defined by the ADAAA. In an expert report dated March 26, 2014, Jon Glass, M.D., Board-Certified in Neurology, opined as follows:

> Based on the documentation provided, it is my opinion that Ms. Omer has a disability that substantially limits major life activities. Specifically, her back pain limits her ability to stand for prolonged periods, to bend, lift, carry, push, pull, bend, climb stairs, twist/rotate, kneel, stooping, crouch or squat. These activities impair mobility and impair her ability to perform the activities of daily living that the average person would be able to perform without difficulty. She has a history of lumbar surgery with residual chronic pain and restriction of motion that is not expected to improve given the lack of response to conservative therapy since the time of surgery.

(FACTS, ¶133)

Ms. Orner suggests to this Honorable Court that based upon the voluminous and undisputed record of impairment, testimony of Ms. Orner and Mr. Stafford, and expert opinion rendered by Dr. Glass, Ms. Orner should be found disabled as a

matter of law, and summary judgment should be granted in favor of Ms. Orner with respect to this element of her claim.

**B.    Ms. Orner is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation**

### 1. Essential functions

Essential job functions are "those that are 'fundamental,' not 'marginal.'" *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 279 (3d Cir.2001) (quoting 29 C.F.R. § 1630.2(n)(2)). That distinction is made on a case-by-case basis, *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 326 (3d Cir.2003) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir.1998) (en banc)), and is an intensely factual inquiry which must be left to a jury. *Jeffrey v. Ashcroft*, 285 F. Supp. 2d 583, 592 (M.D. Pa. 2003).

"An employer's judgment as to the essential functions of a particular job is indeed pertinent evidence. See 29 CFR § 1630.2(n)(3)(I). The employer's judgment, however, is not conclusive. See *Skerski*, 257 F.3d at 283. In this regard, 'an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.' *Davidson*, 337 F.3d at 1191." *Jeffrey*, 285 F. Supp. 2d at 591.

National Beef cites to three cases in its Brief which allegedly stand for the proposition that "it is not uncommon for the ability to stand to be an essential job function," however, in all three cases, the parties agreed that standing was an

essential job function, which is not the case here.  See *Aniskevich v. Blue Ridge Pressure Castings, Inc.*, CIV.A. 3:08-0966, 2009 WL 3335545 (M.D. Pa. Oct. 14, 2009) ("Defendant and plaintiff agree that being able to stand is an essential function of a utility worker at Blue Ridge."); *McEwen v. UPMC Shadyside Presbyterian Hosp.*, 2:09-CV-1181, 2010 WL 4879195 (W.D. Pa. Nov. 23, 2010) ("It is undisputed in the record that the ability to stand throughout a procedure was an essential job function."); and *Moore v. Nissan N. Am., Inc.*, 3:10-CV-569-DPJ-FKB, 2012 WL 2608792 ("Moore's undisputed standing limitations impair his ability to perform at least one function both sides agree is essential - significant, even if not continuous, standing - without a reasonable accommodation.")

Although the Tray Packer position is usually performed while standing (FACTS, ¶72), a Tray Packer position can be performed, at least in part, from a seated position.  (FACTS, ¶6)  While Ms. Orner, specifically, may not have been able to perform the Tray Packer position from a seated position one hundred percent of the time, National Beef admits that Dr. Companion did not state in his letters of February 23, 2012 or April 25, 2012, that Ms. Orner needed to be sitting one hundred percent of the time.  (FACTS, ¶78)  In fact, the Tray Packer position can be performed based upon the accommodation suggested by Dr. Companion, namely that Ms. Orner required a device for her to work a portion of the day from

the seated position, to be used at her discretion, to work either sitting or standing, to decrease her discomfort. (FACTS, ¶78)

A commercially available sit-stand stool that meets the requirements for food preparation applications would provide a reasonable accommodation for Ms. Orner, not present as an undue hardship for National Beef, nor impose a direct threat upon Ms. Orner or others in the work area. (FACTS, ¶6)

In an expert report dated March 26, 2014, Jon Glass, M.D., Board-Certified in Neurology, opined as follows:

> Based on my review of the provided documentation, it is my opinion that Ms. Orner would be able to perform the essential functions of her job with reasonable accommodation. Her treating family practitioner Dr. Companion, has indicated as of 4/25/12 that she would require to be seated on an intermittent basis while performing her duties (at her discretion) with no other accommodations required.

> Based on my review of the provided records and the description of Ms. Orner's job duties as described in both the job description and in her deposition, she would be able to perform the essential duties of her job as a Tray Packer with the single accommodation of sitting down while packing trays on an as needed basis. This accommodation is medically necessary and appropriate in order to alleviate the pain Ms. Orner would experience if required to stand throughout her entire shift without the ability to relieve pressure from her back. This accommodation would not affect essential duties that include gross and fine motor handling with the arms (essential for tray packing), reaching, raising the arms at or above the shoulder, or climbing stairs. The description of other activities, including lifting, carrying, pushing, pulling, bending, climbing stairs, twisting and rotating, kneeling, stooping, crouching or squatting are marginal to the description of her job.

It is therefore my opinion that Ms. Orner would be able to perform the essential functions of a Tray Packer with reasonable accommodation as detailed above based on the job description, the documentation of the history and examination by Dr. Companion and Dr. Askari as well as the history provided Ms. Orner in her deposition.

The opinions offered herein are rendered within a reasonable degree of medical certainty.

(FACTS, ¶78)

## 2.    Reasonable accommodations

As pertinent with respect to the ADAAA, the term "reasonable accommodation," requires an employer to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." *Aniskevich*, CIV.A. 3:08-0966, 2009 WL 3335545 (Internal citations omitted.)   "It includes restructuring the employee's job or modifying the employee's work schedule to enable the employee to continue working with her disability." *Id.* citing "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 C.F.R. pt. 1630, app. ("In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.")

The elements of a reasonable accommodation are further discussed in *Moore v. Nissan North America, Inc.*:

The employee bears the burden of production and persuasion to show the existence of some accommodation that would allow him to perform the essential functions of his position, though he bears only a "light" burden of production in showing the reasonableness of such function "that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 & n. 3 (2d Cir.2009); see [*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–402 (2002)]; [*Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir.1996)]. Once a plaintiff makes a prima facie showing of discrimination, including the existence of a facially reasonable accommodation, the burden shifts to the employer to "demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); see *Barnett*, 535 U.S. at 401–402; [*Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir.1999)]; *Riel*, 99 F.3d at 683.

*Moore*, 3:10-CV-569-DPJ-FKB, 2012 WL 2608792.

With respect to the Reasonable Accommodations required by the ADAAA, Daniel M. Rappucci, a vocational rehabilitative expert, has opined as follows in a report dated March 28, 2014:

According to The Technical Assistance Manual, "when a qualified individual with a disability requests an accommodation, the employer must make a reasonable effort to provide an accommodation that is effective for the individual (gives the individual an equally effective opportunity to apply for a job, perform essential job functions, or enjoy equal benefits and privileges)."

As The Technical Assistance Manual states, in many cases, an appropriate accommodation will be obvious and can be made without difficulty and at little or no cost. Ms. Orner's request for an appropriate accommodation was, in this analyst's opinion, obvious and could have been made without difficulties and at a minimal cost. The accommodation request was a device that would allow Ms. Orner to sit or stand in order that she could complete the essential functions of her job as a Tray Packer.

National Beef did not consult with Ms. Orner to identify potential accommodations requisite to her return to employment as a Tray Packer, nor did National Beef research available sit-stand stool options commercially available that would provide Ms. Orner to perform the essential functions of her work.

(FACTS, ¶130)

Daniel M. Rappucci opined within a reasonable degree of vocational rehabilitative certainty that, "Ms. Orner's physician, Dr. Companion, clearly identified the accommodation that would be necessary to ensure Ms. Orner's return to work as a Tray Packer with a reasonable accommodation.  Specifically, Dr. Companion recommended a device or a chair or a bench that would provide for intermittent sitting."  Mr. Rappucci identified two examples of sit-stand stools with wash down capability that would serve as a reasonable accommodation to allow Ms.  Orner to perform her essential functions as a Tray Packer.  Each sit-stand stool identified by Mr. Rappucci is specifically created for food processing environments where individuals are required to stand for long periods of time. (FACTS, ¶78)  Each of the identified sit-stand stools is made of stainless steel, which National Beef has identified as a necessary criteria for any device which may be used for someone to sit at the Tray Packer line.  (FACTS, ¶101)

With respect to Undue Hardship as addressed by the ADA, Mr. Rappucci has opined as follows in a report dated March 28, 2014:

Upon addressing the matter of undue hardship, the purchase of a sit-stand stool is not an unduly cost.  Placing a sit-stand stool at the Tray Packer line does not represent an extensive nor substantial modification to that work, it would not disrupt the work process, nor would it fundamentally alter the nature or operation of the business.

As of the date of this analysis, the ergoCentric Sit-Stand II Standing Stool, the STS model costs $539.00.  The ergoCentric-Wash Down Stainless Steel Sit-Stand Stool costs $599.00.

(FACTS, ¶131)

### 3.    Interactive process

To show that her employer failed to participate in the interactive process, an employee must demonstrate the following factors: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."  *McClean v. Case Corp., Inc.*, 314 F. Supp. 2d 911, 918-19 (D.N.D. 2004)  (Internal citations omitted.)  "The hallmark of the interactive process is that it be 'flexible.'"  *Williams*, 380 F.3d at 771.  Moreover, "the law should not chill employers' willingness to engage in the interactive process by holding employers liable when . . . experiments do not work out."  *McEwen*, 2:09-CV-1181, 2010 WL 4879195 .

"[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer

violates the ADA." *Moore*, 3:10-CV-569-DPJ-FKB, 2012 WL 2608792, citing *Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731, 736 (5th Cir.1999); *see Cutrera v. Bd. Supervisors of La. State Univ.,* 429 F.3d 108, 112 (5th Cir.2005). "Where 'there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.'" *Mills*, 869 F.Supp. 2d at 624, citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 318 (3d Cir. 1999).

On the morning of February 20, 2012, Ms. Orner went to the production floor, and gave Joe Zimmerman, Superintendent, her doctor's excuse from Dr. Rajjoub stating that she was able to return to work. (FACTS, ¶47) Ms. Orner provided Mr. Zimmerman with the doctor's notes marked MR144 and MR150 on February 20, 2012. Although no restrictions appeared on that note, National Beef, in a letter to Ms. Orner dated March 26, 2012, regarded that Dr. Rajjoub had released Ms. Orner to work with the work restrictions of no bending, lifting and twisting at the waist and no extended sitting or standing. (FACTS, ¶29) Ms. Orner met with Kareem Kelly, the Operations Manager, and Mr. Zimmerman, to discuss her ability to return to work. (FACTS, ¶46) When asked, Ms. Orner advised Mr. Zimmerman that she was "okay." (FACTS, ¶46) Mr. Kelly told Ms. Orner that he was going to be sending her home for the day because the note was too vague, and that he was going to talk to Diane Peifer about it and someone would be calling her later in the day to let her know. (FACTS, ¶47) Diane Peifer, the Human

Resources Manager at Hummels Wharf, was responsible for making the ultimate decision to determine if Ms. Orner was capable of returning to work and able to perform the essential functions of her job with or without reasonable accommodation.  (FACTS, ¶49)

When Ms. Orner met with Mr. Kelly upon first returning to work after her surgery, Ms. Orner appeared to Mr. Kelly to be in pretty significant pain.  (FACTS, ¶98)  Before Ms. Orner left Mr. Kelly asked her what procedure she had done on her back.  After Ms. Orner told him, Mr. Kelly told her that that he felt she was back too soon.  Mr. Kelly advised that Ms. Orner was only nine weeks post-op and most people do not return until twelve weeks post-op, and he did not want her aggravating her back any more and did not want Ms. Orner to become a Workers' Compensation case.  Ms. Orner was then sent home.  Mr. Kelly called Ms. Orner later in the day and told her that the note was too vague, and she would have to get a different note from her doctor before National Beef would allow her to return to work.  (FACTS, ¶47)

On February 21, 2012, Ms. Orner returned to National Beef with a note from Dr. Companion that said she was released to return to work "with restrictions to follow."  (FACTS, ¶48)  National Beef informed Ms. Orner that the note from Dr. Companion dated February 21, 2012 that merely stated "restrictions to follow" was

not specific enough because it did not identify her work restrictions and a more specific note was needed.  (FACTS, ¶51)

On February 23, 2012, Ms. Orner returned to National Beef and provided Ms. Peifer with a note from Dr. Companion that stated:

> [t]his letter is in response to two examinations of the above individual to examine adaptation of her new medical status and the need for workplace accommodations.  Ms. Orner appears to be limited in her mobility due to low back issues as documented by Dr. Rajjoub.  He has specified restrictions needed already.

> From my examinations, [it] will be necessary for Ms. Orner to need a device for her to work a portion of the day from the seated position to decrease her discomfort.  This would be used at her discretion to work either sitting or standing in a safe manner to accomplish her role function.

> If I or my staff may be of further assistance, please contact us.

(FACTS, ¶52)

Mr. Kelly decided that it would not be possible for Ms. Orner to perform her job as a Tray Packer using a chair; however Mr. Kelly did not take any steps to make any tests to see whether the accommodation may work.  Mr. Kelly did not make any investigation to see whether there were any products available that may provide some type of ability for Ms. Orner to sit and work at the production line. (FACTS, ¶55)

On February 23, 2012, Ms. Peifer and Ms. Orner spoke regarding Ms. Orner's ability to perform the essential functions of her job, and Ms. Orner said that

her back would probably not get any better because she needed an additional fusion surgery but she did not want to have it.  (FACTS, ¶56)  When Ms. Orner met with Ms. Peifer on February 23, 2012, Ms. Orner appeared to Ms. Peifer to be in pain and walking bent over.  (FACTS, ¶115)  Ms. Peifer advised Ms. Orner in their meeting of February 23, 2012, that National Beef would not be able to accommodate Dr. Companion's request that Ms. Orner be accommodated with a sitting device.  (FACTS, ¶116)  During their meeting on February 23, 2012, Ms. Peifer asked Ms. Orner if she would like to quit and collect unemployment because of her back, to which Ms. Orner responded that she did not.  (FACTS, ¶117)  Ms. Peifer concluded "almost immediately" that National Beef would not be able to accommodate Ms. Orner.  (FACTS, ¶118)

National Beef was sent a letter on March 6, 2012, sent on Ms. Orner's behalf by counsel, indicating that Ms. Orner wished to return to work.  (FACTS, ¶57)  On March 26, 2012, National Beef sent Ms. Orner a letter requesting an updated medical evaluation regarding Ms. Orner's work restrictions.  (FACTS, ¶58)  The March 26, 2012 letter also specifically stated, "In addition, we are willing to provide Dr. Rajjoub and Dr. Companion with an on-site tour of your specific job, if that will assist them in their evaluation."  (FACT, 59)  In the March 26 National Beef Letter, National Beef said "we do not believe that you could safely perform the essential functions of your job as a Tray Packer on the production line in a

seated position, and it would likely result in even greater bending, lifting, and twisting." (FACTS, ¶61)

On March 30, 2012, a letter was provided to National Beef on Ms. Orner's behalf by counsel with a copy of Dr. Rajjoub's report of January 23, 2012. (FACTS, ¶57)

National Beef next sent Ms. Orner a letter dated April 9, 2012, in which National Beef asked Ms. Orner to provide National Beef with an answer to the question of, "As of today, what, if any, specific work restrictions do you have?" In response, Ms. Orner supplied National Beef with a letter from Dr. Companion dated April 25, 2012. (FACTS, ¶105) In National Beef's letter to Ms. Orner dated April 9, 2012, National Beef asked Ms. Orner to provide her treating physician with the list of essential job functions, a copy of which was enclosed. National Beef enclosed a one page Job Description Form, Bates Stamped NB_0000034. (FACTS, ¶106) Ms. Orner provided Dr. Companion a copy of the job description for the Tray Packer position. (FACTS, ¶107) In fact, the same one page Job Description Form provided by National Beef along with the letter of April 9, 2012, was included in the medical records provided by Dr. Companion. (FACTS, ¶108)

On April 25, 2012, Dr. Companion wrote a note to National Beef in response to "lingering doubts" about Ms. Orner's work environment, stating that "Ms. Orner will need a chair or bench to sit at/on at times throughout the day, while working.

This should make her more productive and functional for longer periods of time. This chair/bench should be used at Ms. Orner's discretion." Dr. Companion invited National Beef to contact him with any questions.  National Beef never contacted Dr. Companion in response to any questions they may have had regarding the contents of his note. (FACTS, ¶64, 65)

On May 3, 2012, a letter was provided to National Beef on Ms. Orner's behalf by counsel with a copy of Dr. Companion's clarifying work release dated April 25, 2012.  (FACTS, ¶57)

In a letter dated May 15, 2012, National Beef again requested clarification regarding Ms. Orner's work restrictions.  (FACTS, ¶67)  National Beef stated that they did not currently believe Ms. Orner would be able to safely perform the essential functions of her Tray Packer position from a seated position.  (FACTS, ¶109)  The National Beef May 15, 2012 letter indicated that people in the Tray Pack position were permitted a 15 minute rest period prior to lunch and a 30 minute lunch period and inquired whether those rest periods would be sufficient to accommodate Ms. Orner's work restrictions.  (FACTS, ¶68)  National Beef further advised Ms. Orner that there were presently no vacant positions other than in Tray Packing.  (FACTS, ¶111)

At the time of the May 15, 2012 letter, National Beef had decided that if Ms. Orner needed to sit at her discretion at the workstation, that was not going to

happen.  (FACTS, ¶110)  Subsequent to May 15, 2012, National Beef did not identify any other jobs beside Tray Packer to which Ms. Orner may return. (FACTS, ¶112)

Although Ms. Orner's physicians never went to National Beef to determine her ability to perform the essential functions of the job  (FACTS, ¶62), National Beef has no reason to believe that Dr. Companion is not familiar with general industrial setups, including things like assembly lines.  (FACTS, ¶92)  In fact, National Beef never had a treating doctor visit their facility in any other situations. (FACTS, ¶91)  Not only is it rare that a treating physician would visit an industrial or production setting in order to review the essential functions of an individual's job, (FACTS, ¶93), it is not necessary for Dr. Companion to visit a job site or to review a job description in the interactive process.  (FACTS, ¶94)  Rather, the doctor's role is to provide those safe working parameters for the individual in the performance of the job in question, or any job.  (FACTS, ¶94)

National Beef never tested or actually put a chair on the floor to test its theories that such an accommodation was not reasonable.  At most, National Beef had Nick Kovaschetz sit in a squatting position and reach up to confirm that he could not reach the overhead lines.  (FACTS, ¶81)  Ms. Peifer testified that she did not test the possibility of using a sitting device at the Tray Packer line because, "common sense and just being able to look at it, you can clearly see that it cannot

be performed from a seated position safely or efficiently." (FACTS, ¶102) National Beef never made any searches on the open market for any type of chairs or devices that could be used to sit at a work station such as the Tray Packer work station. (FACTS, ¶103) Ms. Peifer envisioned that the device requested by Ms. Orner would be a simple folding chair. (FACTS, ¶115)

Ms. Orner had scheduled breaks daily from 9:00 to 9:15 AM and 12:00 to 12:30 PM. (FACTS, ¶8) Other than at the scheduled break times, Tray Packers were generally permitted to leave their work position to use the restroom but were otherwise expected to remain at their work stations; however, individual Tray Packers with certain conditions such as pregnancy, diabetes, arthritis or other problems were allowed to take a break outside the regular break times. (FACTS, ¶9) National Beef never communicated to Ms. Orner that she may have been permitted to take additional breaks during the day. (FACTS, ¶95)

With respect to the interactive process and reasonable accommodations required by the ADAAA, Mr. Rappucci, has opined as follows in a report dated March 28, 2014:

> Essentially, in regard to fulfilling the requirements of the interactive process, Ms. Peifer had placed the burden only on Ms. Orner and her physicians. Subsequent to Ms. Orner returning to National Beef on 2/23/12, there was no discussion after that point regarding the specific reasonable accommodation that Ms. Orner was requesting. As will be demonstrated Ms. Peifer had "almost immediately" made her determination that Ms. Orner would not be accommodated.

As Ms. Peifer stated, at the time National Beef began to request information on "you know, would extra breaks help" that was never answered, so the rest of the interactive dialog, "kind of came to a standstill there".

It is interesting in this analyst's opinion, as to how National Beef, during their efforts to have Ms. Orner obtain additional information from Dr. Companion regarding her ability to do the essential functions of her position, particularly in regard to "utilizing a device" that would afford her the opportunity to sit or stand at her discretion, moved in the direction of wanting to determine if the break periods, which are standard for someone working in her position, would suffice in allowing her to perform the duties of a Tray Packer. If the issue of breaks would have sufficed, this question could have been asked of Ms. Orner upon her return on 2/20/12 when she was sent home.  As the records reflect, Dr. Rajjoub indicated Ms. Orner could return to work on 2/20/12 and she should exercise caution with lifting and bending.  It would appear at this time that the question of breaks sufficing as a reasonable accommodation, could have been asked, answered, and a determination made at that time with Ms. Orner, if in fact that would be suitable for her and thus no accommodation would be required in order for her to perform her duties of a Tray Packer.  The question regarding if the normal breaks provided to a Tray Packer during the course of a work shift would suffice did not surface until Ms. Peifer's correspondence to Ms. Orner dated 5/15/12.[2]

The response by Ms. Peifer that the interactive process came to a standstill as Ms. Orner did not have questions answered, particularly the question in regard to "would breaks suffice", is not an accurate depiction of the Interactive Process in this Analyst's opinion.  The Interactive Process came to a standstill on 2/23/12, when Ms. Orner returned to National Beef with correspondence from Dr. Companion, indicating that in order for her to return to work she would need a

---

[2]      Of course, the irony of National Beef asking on May 15, 2012, if Ms. Orner's normal breaks would suffice, is that if Ms. Orner's normal breaks would have sufficed to allow her to sit as needed, Ms. Orner could have simply returned to work without the need for any accommodation.

device that could be used at her discretion to work either sitting or standing in a safe manner in order to accomplish her role function. Unfortunately, on 2/23/12, in discussion with Ms. Peifer, Ms. Orner was told that National Beef would not accommodate her and suggestion was made to Ms. Orner that she quit her job and collect unemployment.

The 2/23/12 meeting between Ms. Orner and Ms. Peifer represented a perfect opportunity for both parties to address Dr. Companion's opinion regarding the reasonable accommodation that Ms. Orner would require in order to do the essential functions of a Tray Packer. This dialog did not take place, but rather National Beef persisted in requesting that Ms. Orner continue to clarify her work restrictions, review her essential job duties with her physician, requesting if she can perform the functions of the job with or without reasonable accommodation, and to invite her physician to National Beef in order that he could observe the Tray Packer duties and render further comment regarding Ms. Orner's ability to do these duties with or without reasonable accommodation.

In both Dr. Companion's 2/23/12 correspondence and his follow-up correspondence of 4/25/12, he states Ms. Orner's need for a chair, bench, or device to sit at/on at times throughout the day while working in order to make her more productive and functional for longer periods of time and to be used at her discretion. In this analyst's opinion, Dr. Companion's words speak for themselves. On 2/23/12, National Beef, in regard to having an effective interactive process with Ms. Orner, should have discussed and researched with Ms. Orner what "device" would meet Dr. Companion's recommendation and provide Ms. Orner the opportunity to return to employment.

\* \* \* \*

As this analyst will discuss and demonstrate, there are sit/stand devices readily available that, in this analyst's opinion would satisfy Dr. Companion's recommendation that Ms. Orner have the ability to sit or stand as a Tray Packer and at her discretion. The availability of a device was not researched by National Beef, nor was any device tested by National Beef to determine, if in fact, this reasonable

accommodation could be made.   Ms. Peifer, in her deposition testimony, did state that Mr. Kovaschetz, "sort of sat in a squatting position and reached up and you could clearly see he couldn't even reach the overhead line".   As far as this analyst can determine, this appears to be the only effort National Beef made to determine if Ms. Orner would be able to perform her job from a seated position at her discretion.   This analyst does understand that there is a component of the Tray Packing line on which the empty trays are held.   These trays would require an individual to be standing in order to reach these trays, which are then placed on the work surface and the appropriate meat product is trayed/packed.   In Ms. Peifer's deposition testimony, in reference to answering the question, "you actually haven't tested anything", she responds, "No".   When asked, "Is there a reason for that?"   Ms. Peifer responds, "I stated earlier, common sense and just being able to look at it, you can clearly see that it cannot be performed from a seated position safely or efficiently".   *In regard to the matter of "common sense", this analyst would offer that common sense also dictates that an individual who can perform her job from either a seated or standing position would have to stand for those times when trays need to be retrieved from the upper level of the work station.*

Based upon Ms. Peifer's deposition testimony, she does not discuss with specificity, Dr. Companion's recommendation that Ms. Orner sit or stand at her discretion, but rather focuses upon Ms. Orner performing the job of a Tray Packer from a seated position.   When questioned if it is her contention that based upon Dr. Companion's recommendations that Ms. Orner would need to be standing 100% of the time, Ms. Peifer responds, "to do that job safely, yes."   When again questioned in regard to Dr. Companion's recommendations, Ms. Peifer notes that, "the note is vague".   Ms. Peifer ultimately does concede that Dr. Companion's note does not indicate that Ms. Orner needs to be standing or sitting a hundred percent of the time.

(FACTS, ¶129)

Ms. Peifer is not familiar with the <u>Technical Assistance Manual</u> of the ADA

or the Job Accommodation Network.   (FACTS, ¶119, 120)   With respect to Ms.

Peifer's qualifications and their impact on the interactive process, Mr. Rappucci has opined as follows in a report dated March 28, 2014:

> In the EEOC's Technical Assistance Manual on the Employment Provisions of the Americans with Disabilities Act, a "reasonable accommodation is a modification or adjustment to a job, the work environment, or the way things usually are done that enables a qualified individual with a disability to enjoy an equal employment opportunity, i.e., an opportunity to attain the same level or performance or enjoy … the privileges of employment as are available to an average similarly situated employee without a disability". The Technical Assistance Manual, published to help employers learn about their obligations and rights under the Employment Provisions of the Americans with Disabilities Act, provides examples of reasonable accommodations that include altering when or how an essential function is performed, obtaining or modifying equipment or devices, etc. Appropriate accommodations may not always be easily identified. In such cases, the EEOC regulations require an interactive process to find an effective accommodation. The Technical Assistance Manual (TAM) provides an outline for identifying a reasonable accommodation that can be used within the context of the interactive process. If, in consultation with the individual needing an accommodation, a potential accommodation or an effective accommodation cannot be identified, there is technical assistance available from numerous sources, many of which are free. The Technical Assistance Manual does provide a list of such resources to assist with the accommodation process. The Job Accommodation Network (JAN), US Department of Labor's Office of Disability Employment Policy, also offers recommended processes for determining and maintaining effective communication options to include job observation to identify the essential functions of the job; meeting with an individual to discuss his/her specific abilities or limitations, as these relate to the essential job functions for example identifying barriers and how these could be overcome, discuss accommodations that could address any perceived barriers to the performance of the essential job functions-getting technical assistance if necessary to assist identifying potential accommodations; provide effective training and allow the employee and supervisors an

51

opportunity to learn new methods of doing things or using new equipment to support the success of the accommodation.

Beyond methodology, the accommodation process requires a mindset that recognizes the need for turning to problem solving in the identification of reasonable accommodations and a work environment that is accepting of disabilities and reasonable accommodation. The process of determining the potential to accommodate and manner of accommodation needs to be focused on uncovering the means and methods to empower an individual with a disability to perform the essential functions of her job. This does not appear to have occurred in the setting of Ms. Orner's employment with National Beef.

Ms. Diane Peifer, in her deposition testimony of 2/5/14, acknowledges that she is not familiar with The Technical Assistance Manual (TAM) of the Americans with Disabilities Act nor is she familiar with the Job Accommodation Network. Ms. Peifer's unfamiliarity with these resources may have, in part, impacted what Ms. Peifer misperceived to be an effective interactive process with Ms. Orner.

(FACTS, ¶128)

Mr. Rappucci's concludes by stating that, "In this analyst's opinion, National Beef did not comply with the spirit of the interactive process nor was National Beef interested in determining a reasonable accommodation for Ms. Orner." (FACTS, ¶128) Additionally, National Beef did nothing to experiment or test any accommodations, even though such a process is encouraged. See *McEwen*, 2:09-CV-1181, 2010 WL 4879195 ("the law should not chill employers' willingness to engage in the interactive process by holding employers liable when . . . experiments do not work out.")

In *Mills v. Temple University*, the court refused to grant summary judgment with respect to the interactive process in a similar situation where the defendant discussed the plaintiff's matter "between themselves for five to fifteen minutes and immediately rejected" plaintiff's request. *Mills*, 869 F. Supp. 2d at 624. Similarly, Ms. Peifer has testified that she rejected Ms. Orner's requested accommodation "almost immediately," and never made any further inquiry or tests beyond a brief conversation with Mr. Kovaschetz.

National Beef cites *Stadtmiller v. UPMC Health Plan, Inc.* as a comparator case to demonstrate that National Beef discharged its responsibilities with respect to engaging in an interactive process; however, the facts in *Stadtmiller* are far removed from this case. In *Stadtmiller*, the record indicated that "Stadtmiller requested, and was provided with, three accommodations: (1) scheduling flexibility, (2) a voice recorder, and (3) modifications to his workspace . . . In particular, upon learning of Stadtmiller's disabilities, UPMC met with him to discuss what accommodations he might need, quickly responded to his requests, ensured that his requests had been fulfilled, and detailed what he needed to do to improve his performance to meet the standard of his department." *Stadtmiller v. UPMC Health Plan, Inc.*, 491 F. App'x 334, 336-337 (3d Cir. 2012). It was not until after UPMC provided accommodations and monitored Stadtmiller's performance that UPMC concluded that Stadtmiller's performance had not

improved and terminated him. *Id.* at 335. In stark contract to Stadtmiller, Ms. Orner requested an accommodation and was immediately, summarily and continuously denied any accommodation. Unlike in *Stadtmiller*, National Beef did not ensure that Ms. Orner's requests had been fulfilled.

Unquestionably, at a minimum, questions of fact exist with respect to whether National Beef failed to properly participate in the interactive process, so as to preclude summary judgment. As demonstrated, National Beef did not take any steps to investigate whether Ms. Orner's requested accommodation was reasonable - no tests were initiated, with or without Ms. Orner's participation, and no searches were conducted by National Beef to identify available products. Rather, National Beef summarily decided, without the benefit of any available technical resources, that Ms. Orner could not be accommodated. Furthermore, although alternate accommodations, such as additional breaks, may have been available and may have met Ms. Orner's needs, such alternate accommodations were never suggested to Ms. Orner in lieu of her proposed accommodation or made available to her.

### 4.   Direct Threat

National Beef has alleged that Ms. Orner's only requested accommodation poses a direct threat to herself and other employees. As the court explained in *Grosso v. UPMC*,

> Under the pre–2009 ADA, an employee constitutes a direct threat if he or she poses "a significant risk to the health or safety of

others that cannot be eliminated by reasonable accommodation." [42 U.S.C.] § 12111(3).  The employer has the burden of showing that the employee is direct threat.  *EEOC v. Hussey Copper Ltd.,* 696 F.Supp.2d 505, 520 (W.D.Pa.2010).   Determining whether an employee is a direct threat requires an "individualized assessment" using "reasonable medical judgment" of the employee's ability to perform his or her essential job functions. 29 C.F.R. § 1630.2(r). The regulations list four factors to consider when making the determination: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." *Id.* § 1630.2(r)(1)-(4).   The question is not whether a risk exists, but whether the risk is significant.  *Doe v. County of Centre,* 242 F.3d 437, 447 (3d Cir.2001) (quoting *Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998))

*Grosso v. UPMC*, 857 F. Supp. 2d 517, 535 (W.D. Pa. 2012).

The Tray Packer lines were made and installed at National Beef by employees of National Beef using stainless steel sheets which were cut and bent at an outside facility.  National Beef welded the stainless steel, cut the white table tops, and anchored the lines to the building.  (FACTS, ¶99)  The production lines were designed to leave 28 inches for egress between people working on the production lines as required by OSHA, plus 24 inches on either side for people working, for a total of 76 inches between production lines.  (FACTS, ¶16)  The Sit/Stand Stool identified by vocational rehabilitative expert Daniel M. Rappucci, M.A., LRC, LPC, would fit within the 24-in. space allocated for the worker along the Tray Packer line.  These stools can be moved in the event of an evacuation by simply pushing the stool against the Tray Packer line.  In reference to Ms. Peifer's

opinion that a chair at the Tray Packing station would present as a slip hazard, it is recognized that there is a 24-in. space for the worker.[3] Therefore, if someone is moving through the 28 in. aisle that represents the required space for egress, there would be no apparent reason why an individual moving through this aisle would not walk within this designated space.  Furthermore, Mr. Rappucci opines that, "Based upon this analyst's experience as a Vocational Rehabilitation Analyst, observation of job sites and completion of Job Analyses, all jobs require remaining alert to execute job duties and no work setting is without some equipment or stationary materials that could present as a tripping or fall hazard."  (FACTS, ¶74)

National Beef's belief that providing Ms. Orner with a sitting device to use while working on the tray packing line would cause greater injury was based upon the individual beliefs of Diane Peifer and Nick Kovaschetz and not based upon discussions with any type of doctor or consultant.  (FACTS, ¶100)  Although National Beef Safety Manager, Nicholas Kovaschetz, believes that permitting the use of a chair on the Tray Packer production line would create a hazard by increasing the risk of other employees tripping and falling over the chair and create an egress hazard in violation of OSHA, Mr. Kovaschetz never tested the theory of having someone seated at the tray pack line or seen or heard of anyone doing so.

---

[3] Even if the estimated line clearance is factually somewhat less than the estimate provided by Dean Sampsell (FACTS, ¶16), egress is still not an issue because, as stated by Nick Kovaschetz, the OSHA regulation requiring 28 inches of egress clearance (29 C.F.R. 1910.36), does not prohibit objects which may be in the area of egress but can be moved, such as a stool.  (FACTS, ¶80)

(FACTS, ¶79)  In fact, when Tray Packers have to move from line to line, they do not run, rather they walk in an orderly fashion.  They were never rushed.  (FACTS, ¶97)  Furthermore, Kovaschetz testified that the OSHA regulation requiring 28 inches of egress clearance (29 C.F.R. 1910.36), does not prohibit objects which may be in the area of egress but can be moved.  (FACTS, ¶80)   Additionally, performing the Tray Packer position does not require any lateral movement, just some pivoting from side to side, without moving one's feet.  (FACTS, ¶104)

As Safety Manager, Mr. Kovaschetz was responsible for keeping the floors clean of slip hazards.  (FACTS, ¶96)   Although Ms. Orner testified that the production floor "gets a little wet", in the past two years prior to February 2014, National Beef has experienced "next to none" in terms of slip and fall accidents. (FACTS, ¶10)

In a report dated March 28, 2014, Mr. Rappucci concludes as follows, within a reasonable degree of vocational rehabilitative certainty:

In conclusion, this analyst would note the following:

1. Ms. Orner is a qualified individual with a disability, in that she had worked as a Tray Packer for National Beef for many years, and that she has a musculoskeletal impairment that impacts the major life activities of sitting, standing, and working.

2. Ms. Orner's physician, Dr. Companion, clearly identified the accommodation that would be necessary to ensure Ms. Orner's return to work as a Tray Packer with a reasonable accommodation. Specifically, Dr. Companion recommended a device or a chair or a bench that would provide for intermittent sitting.

3. National Beef impeded the interactive process by their failure to recognize that Dr. Companion's recommendation for a "device" to provide the opportunity for intermittent sitting needed further clarification prior to allowing Ms. Orner a return to work opportunity. Further, National Beef never assumed the burden of determining what or how Ms. Orner could effectively be accommodated in performing the essential functions of her job as a Tray Packer. They placed this burden on physicians and on the worker and removed themselves from the process.

4. National Beef attempted an argument in regard to the safety of Ms. Orner and other workers. None of their concerns in regard to safety rise to the level of a direct threat, as it is defined in the Employer's Handbook (The Technical Assistance Manual).

(FACTS, ¶133)

National Beef offers *McClean v. Case Corp., Inc.* as a comparative case to Ms. Orner's to attempt to establish that Ms. Orner's requested accommodation creates a direct threat. However, in *McClean*, McClean's own treating neurologist explained to the employer her concerns about McClean's safety, and McClean presented no evidence to contradict McClean's status as a direct threat in Case's production environment. *McClean*, 314 F. Supp. 2d at 915. To the extreme contrary, in Ms. Orner's case, both Mr. Rappucci and Dr. Glass have opined that Ms. Orner's requested accommodation is reasonable and does not present a direct threat to herself or others.

National Beef's arguments rely solely on untested, vague theories that Ms. Orner's proposed accommodation will create an egress hazard, a theory which is

based solely on speculation, as it was never tested, and notwithstanding the fact that OSHA regulations would not prohibit this accommodation.   Furthermore, National Beef offers no "reasonable medical judgment" with respect to Ms. Orner's ability to perform her essential job functions.   Finally, National Beef's arguments regarding a direct threat make no mention of the potential accommodation which was never offered to Ms. Orner in lieu of her proposed accommodation; namely, additional breaks to be taken off the work floor, which  unquestionably would not create a risk to anyone on the work floor.   At a minimum, the facts on the record, including the opinions of both Mr. Rappucci and Dr. Glass, demonstrate that an issue of fact is raised with respect to the issue of "direct threat."

### 5.    National Beef has no legitimate, non-discriminatory reason for not allowing Ms. Orner to return to work

National Beef attempts to argue that it can overcome a presumption of discrimination by providing a legitimate, non-discriminatory reason for its employment actions.   However, Ms. Orner has never argued that National Beef's employment actions were made under pretext, nor does the record reflect any reason proffered by National Beef with respect to failing to allow Ms. Orner to return to work other than as related to her request for an accommodation.   In fact, Ms. Peifer testified that no other reason existed.   (See FACTS ¶134, "Q. Let me put it this way, if [Ms. Orner] had been in perfect health, full recovery, six week timeframe, doctor said nothing to stop her from doing her job a hundred percent all

day long, all I want to ask is did the company have any issues with her returning to work in the normal course if there had been no medical issues?  A.  No.")

No issue of pretext has been raised or exists on the record, and National Beef has not provided any alternate reason or theory for refusing to return Ms. Orner to work.  Therefore, National Beef's actions with respect to Ms. Orner's attempts to return to work either conformed with or violated the requirements of the ADAAA. As stated previously, it is clear that, at a minimum, material issues of fact exist with respect to each of the elements of Ms. Orner's claim under the ADAAA, and that summary judgment is inappropriate in this case.

## VII.  <u>CONCLUSION</u>

For all of the forgoing reasons, it is respectfully requested that this Honorable Court deny Defendant's Motion for Summary Judgment, and grant Summary Judgment to Plaintiff on this issue of whether Ms. Orner is disabled under the ADAAA.

Respectfully submitted,

McCarthy Weisberg Cummings, P.C.

May 5, 2014          /s/ Larry A. Weisberg
Date                           Larry A. Weisberg, Esquire
                              PA Bar I.D. #: PA83410
lweisberg@mwcfirm.com

Derrek W. Cummings, Esquire
PA Bar I.D. #: PA83286
dcummings@mwcfirm.com

2041 Herr Street
Harrisburg, PA 17103-1624
(717) 238-5707
(717) 233-8133 (FAX)

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Larry A. Weisberg, Esquire, hereby certify that the foregoing **Brief in Opposition of Defendants' Motion for Summary Judgment** has been filed electronically and is available for viewing and downloading through the Court's Electronic Case Filing (ECF) System.  Upon the electronic filing of a pleading or other document, the Court's ECF System will automatically generate and send a Notice of Electronic Filing to all Filing Users associated with that case. Transmission of the Notice of Electronic Filing constitutes service of the filed document pursuant to Standing Order No. 05-6, ¶12.2.1.  Accordingly, service was made to all counsel of record in this matter.

<u>/s/ Larry A. Weisberg</u>
Larry A. Weisberg