IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CANDY S. ORNER, | : | No. 4:13-cv-0837 |
| | : | |
| Plaintiff, | : | Judge Brann |
| | : | |
| v. | : | |
| | : | |
| NATIONAL BEEF PACKAGING | : | |
| COMPANY, LLC, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**
December 9, 2015

In consideration of the parties' briefing, this case's procedural history, and the <u>Daubert</u> hearing before the Court, Defendant's Motion to Strike is granted in part and denied in part in accordance with this Memorandum. Specifically, Daniel M. Rappucci's methodology is sufficiently reliable under <u>Daubert</u> and <u>Paoli II</u>, but his testimony will be subject to thorough cross-examination and is limited as set forth herein. In addition, neither Mr. Rappucci nor any other expert may offer legal conclusions as to whether Defendant violated the ADA.

## I.    BACKGROUND

The particular facts of this case have been set out at length in Magistrate Judge Thomas M. Blewitt's October 8, 2014 Report and Recommendation granting part and denying in part Defendant's First Motion to Strike Mr. Rappucci's Expert

Report[1] as well as Chief Magistrate Judge Martin C. Carlson's Report and Recommendation denying Plaintiff's Motion for Summary Judgment.[2] Nevertheless, the pertinent facets of this case's history are reiterated here.

Plaintiff began working as a "tray packer" at Defendant's Hummel's Wharf beef packaging facility in 2005.[3] As a tray packer, Plaintiff worked side-by-side other beef packers on a production line, standing and facing long metal tables that contained a work area and a beef conveyor belt.[4] Tray packers like Plaintiff reach and grab Styrofoam meat trays from above the packing lines and arrange cuts of meat on the trays as the meat moves along the conveyor belt.[5] The finished product of a tray packer resembles a package of various meat cuts that a consumer might purchase at a supermarket from the butcher's shelf.

Beginning in 2005 and continuing through 2011, Plaintiff began to suffer back pain that affected her ability to perform the essential functions of her tray-packing job.[6] Plaintiff has a history of back problems, including degenerative disc disease, for which she took certain prescription medication and received physical therapy during her employment with Defendant.[7] Ultimately, Plaintiff would end

---

[1] ECF No. 55.
[2] ECF No. 60.
[3] Id. at 4. Hummel's Wharf is a "census-designated place" (CDP) in Snyder County, Pennsylvania.
[4] Id.
[5] Id.
[6] Id.
[7] Id.

up missing several weeks of work beginning in late 2011 due to back surgery.[8]

Plaintiff claims that Defendant repeatedly denied her requests for a reasonable accommodation pursuant to the Americans with Disabilities Act that would have allowed her to return work after her 2011 surgery.[9] Though Plaintiff attempted to return to work in February 2012 with the aid of certain doctors' notes, those attempts proved unsuccessful.[10] Specifically, the record reveals certain misgivings on Defendant's part as to whether Plaintiff could effectively perform her meat tray-packer role from a seated position.[11] Plaintiff and Defendant accordingly dispute the extent to which Plaintiff's not being able to return to work constituted a violation of the ADA in the form of a failure to accommodate claim. To that end, on March 23, 2015, this Court adopted in full Chief Magistrate Judge Carlson's Report and Recommendation denying Defendant's Motion for Summary Judgment.[12] Jury selection and trial is set to begin on February 22, 2016.[13]

As it relates to the present issue, this is not the first time that Defendant has contested Mr. Rappucci's admissibility as an expert. In fact, this is effectively Defendant's second bite at the apple of exclusion. On May 30, 2014, Defendant filed a Motion to Strike certain exhibits on which Plaintiff had relied on in her

---

[8] Id. at 5.
[9] Id. at 1–2 (citing 42 U.S.C. § 12101 et seq).
[10] ECF No. 60 at 5.
[11] Id.
[12] ECF No. 61.
[13] ECF No. 74 at 1.

opposition to Defendant's Motion for Summary Judgment.[14] One of those exhibits was the presently contested expert report of Mr. Rappucci.[15] According to Defendant, Mr. Rappucci's report should have been excluded under Fed. R. Evid. 702 because it was "unreliable, unhelpful and assert[ed] legal conclusions."[16] This Court largely disagreed, adopting in full Magistrate Judge Blewitt's Report and Recommendation, which granted in part and denied in part Defendant's Motion to Strike.[17] In its Order, this Court explained:

> To the extent that Plaintiff's expert Rappucci's Report offers opinions on legal issues, they are excluded. The remainder of Rappucci's Report and the report of Plaintiff's expert Dr. Glass are not excluded.[18]

That particular language was included in the Order to clarify Magistrate Judge Blewitt's recommended disposition. Magistrate Judge Blewitt wrote:

> As discussed above, we agree with Plaintiff that Rappucci's testimony is reliable and very relevant in this case. We find that Rappucci should be allowed to testify about the stated issues and render his mentioned opinions in this case. We find that his testimony is relevant to the jury's determination in this case with respect to Plaintiff's ADA claim against Defendant, and that it will aid the jury in resolving the factual disputes in this case. However, as discussed, to the extent Rappucci states an opinion as to whether Defendant has complied with the law, we find that Rappucci's testimony should be excluded.[19]

Defendant now brings what is essentially a renewed Motion to Strike Mr.

---

[14]   ECF Nos. 44, 45 at 1.
[15]   ECF No. 45 at 2.
[16]   Id.
[17]   ECF No. 58.
[18]   Id. at 2.
[19]   ECF No. 55 at 17.

Rappucci's same report. In all fairness to Defendant, what at least in part has prompted this subsequent challenge to Mr. Rappucci's reliability were statements made by him during his July 9, 2015 deposition.[20]

Although Plaintiff correctly notes that Mr. Rappucci's underlying report and methodology has not changed since the first Motion to Strike, certain portions of the July 2015 deposition, both as reiterated by Veronica Winter Saltz, Esquire, counsel for the defense, during a status conference with this Court and as gathered by the Court during its own independent review of the deposition testimony, were, to put it plainly, less than confidence-inspiring. While the Court well understands the stresses associated with giving (or taking) deposition testimony, certain of the shortcomings evident during Mr. Rappucci's deposition—particularly those involving uncertainty as to measurements and the lack of meaningful vocational testing—are likely to hinder his credibility with a jury in a reasonable accommodations case.

Still, as explained more fully below, the framing of the instant Motion during the Court's <u>Daubert</u> hearing was functionally more akin to a motion in limine than a motion to strike Mr. Rappucci's analysis in full. This posture was further facilitated by the fact that Mr. Rappucci's report can be demarcated into five distinct issues: (i) reasonable accommodation; (ii) direct threat to self;

---

[20]  ECF No. 77 Ex. 2.

(iii) direct threat to others; (iv) undue hardship; and (v) qualified individual with a disability status. Moreover, given the existence of the preceding Order adopting in full Magistrate Judge Blewitt's Report and Recommendation, the Court and the parties have deemed it necessary to more fully flesh out the bounds of Mr. Rappucci's testimony so that the parties' expectations about trial are as settled as possible.

Defendant primarily contends that Mr. Rappucci's methodology lacked the kind of thoroughness otherwise required to ensure reliability and subsequent testing. According to Defendant:

> By his own admission, Rappucci relied on no measurements, applied no methodology, conducted no testing, performed no job analysis, requested no functional capacity evaluation, did not consider if Orner could perform the essential functions of her job with his suggested accommodation, performed no risk analysis as to safety relating to Orner and National Beef's employees and did not even purchase the suggested accommodation–a sit-stand stool. All Rappucci did in formulating his opinions/conclusions was to conduct a one-time vocational clinical interview of Orner, visit National Beef's plant and perform an internet search to find two "examples" of a sit-stand stool. By his own admission, his only concern was whether a sit-stand stool could physically be placed on the assembly line.[21]

Plaintiff, however, describes Defendant's efforts on this second Motion to Strike as follows:

> All Defendant offers beyond what they argued in their previous attempt to strike Rappucci as an expert is take snippets of Rappucci's deposition and place them before the Court in a way that is either (1)

---

[21] ECF No. 77 at 2–3.

6

misleading and out of context or (2) a simple reiteration of Rappucci's report which has already been ruled upon favorably by the Court. [22]

Plaintiff contends that Defendant mischaracterizes Mr. Rappucci's methodology, stating that in fact his review of the facts was much more extensive:

> Rappucci's report details in Appendix A both the factual record as well as the technical resources relied upon by Rappucci to formulate his report and opinions. In addition to an onsite visit on August 29, 2013, in which Rappucci observed the job duties of a Tray Packer and the design of the Tray Packer line to assess potential reasonable accommodations for Ms. Orner, Rappucci interviewed Ms. Orner on July 2, 2013. Rappucci also reviewed National Beef records, the depositions of all National Beef employees, the pleadings in the case, National Beef's responses to Plaintiff's Interrogatories and Ms. Orner's voluminous medical records. Rappucci referred to photographs taken during his onsite visit at National Beef as well as technical resources available, including the EEOC's Technical Assistance Manual and the Job Accommodation Network. [23]

The contested reasonable accommodation that emerged from Mr. Rappucci's analysis was a "sit-stand stool," a device resembling a stool with a back support that would purportedly permit Plaintiff to remain standing in a seated position at her spot in the meat packing line. [24] At his deposition, Mr. Rappucci repeatedly indicated that although he did not note all possible measurements, he focused on the measurements that "were important" to him in determining whether a sit-stand stool could reasonably accommodate Plaintiff. [25] Specifically, Mr. Rappucci stated

---

[22] ECF No. 82 at 11.

[23] ECF No. 82 at 10.

[24] Photos and attendant descriptions of potential sit-stand stools are available in Mr. Rappucci's report. ECF No. 77 Ex. 1 at 15–16.

[25] ECF No. 77 Ex. 2 at 11.

the following during his deposition:

> I pretty much was on my own to observe the meat, how it came down the conveyor belts, observe how the individuals took it from the belts, packed it, put it back—trayed[sic] it, put it back on the belts. I observed where they worked, their workstation. I observed the number of people. I observed the amount of meat. I observed the area, took some pictures, took some measurements, and I was done.

> . . .

> I believe I took measurements of the height of the packing shelf to the floor, the distance under the—under the unit, you know, like say from the end of the packing shelf to where it kind of obstructed off.

> . . .

> I measured the—I looked at the lean into the tray—to the meat area. I measured the people back to back, how much distance was between the rows of the people. I measured—I'm trying to remember what my notes mean here hang on a second—the number of people on the lines, how many lines, the height of some of the trays that were stacked on the middle of that unit, if you know—you know, the clean trays that they reach up for, the edge of the packaging tray to the underside. I called it a slap or drip tray. There was a drip tray there eight-inch depth, the distance from one tray line to the other line, and I looked at the height of the unit, you know, the various—like the— where they package, the white—the white unit to the floor, the center line tray reach, as I said, reach to the high trays.

> I measured things, you know, based on my finger to waist measurements in consideration of Candy being 5 foot 1 and I being 5 foot 6. I measured—well, I think I've given you pretty much everything.

> I looked at the height to the trays, the height of the unit to the floor, the distance under the unit before obstruction, the distance between the units. You know, when I say "unit," I mean the whole tray packing line, distance between the two. That's about it, I guess. That's all I can figure out from these old notes.

Moreover, Plaintiff argues that even given the foregoing, the admissibility of Mr. Rappucci's testimony has already been established and that it would be improper for this Court to wholly renounce its prior Order under the law of the case doctrine, given what little has changed since that time.[26]

## II.   LAW

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony. They provide as follows:

> **Rule 702. Testimony by Expert Witnesses**
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[27]
>
> **Rule 703. Bases of an Expert's Opinion Testimony**
> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to

---

[26] ECF No. 82 at 2–5.
[27] Fed. R. Evid. 702.

the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.[28]

In 1993, the Supreme Court of the United States set out the standard for admissibility of expert testimony in federal court in Daubert v. Merrell Dow Pharm., Inc.[29] The Court in Daubert delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires them to "determine at the outset" whether an expert witness can "testify to (1) scientific knowledge that (2) will assist the trier of fact."[30] That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[31] Daubert also clarified that the proponents of the expert must establish admissibility by a preponderance of the evidence.[32]

Though it recognized that "many factors" are relevant to this inquiry and that "a definitive checklist or test" does not exist, the Daubert Court enumerated four relevant questions for district courts to consider when making the Rule 702 determination: (1) whether the disputed methodology is testable; (2) whether the

_____

[28] Fed. R. Evid. 703.
[29] 509 U.S. 579 (1993).
[30] Daubert, 509 U.S. at 592.
[31] Daubert, 509 U.S. at 592–93.
[32] Daubert, 509 U.S. at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175–76 (1987)). See also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (Becker, J.) ("This does not mean that plaintiffs have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.").

disputed methodology has been peer-reviewed; (3) the methodology's known or potential rate of error; and (4) whether the methodology is generally accepted in the relevant scientific community.[33]

Daubert explained that district courts should conduct this inquiry in addition to that already mandated by Federal Rules of Evidence 703, which governs admission of expert testimony using data reasonably relied upon by experts in a particular field, and Federal Rule of Evidence 403, which permits exclusion of relevant evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[34] A district court "exercises more control over experts than over lay witnesses," the Supreme Court observed, since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[35] Six years later, in Kumho Tire Co. v. Carmichael, the Supreme Court extended Daubert's holding as well as the district court's gate-keeping role beyond scientific expert testimony to all expert testimony based on "technical" or "other specialized knowledge."[36]

In 1994, the United States Court of Appeals for the Third Circuit issued its interpretation of Daubert in In re Paoli R.R. Yard PCB Litig., a decision known as

---

[33] Daubert, 509 U.S. at 593–94.

[34] Fed. R. Evid. 403.

[35] Daubert, 509 U.S. at 595 (quoting Hon. Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

[36] 526 U.S. 137 (1999)

Paoli II.[37] Paoli II cast the expert admissibility determination in light of three requirements: (1) qualification; (2) reliability; and (3) fit.[38] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[39] The Third Circuit has interpreted this requirement broadly.[40] In this Court's view, the requirement that does the most work is naturally that of reliability. To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[41] Paoli II set forth an additional four factors to those provided in Daubert. That list of factors, which "a district court should take into account," reads as follows:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[42]

With regard to the third prong, fit, the Paoli II Court explained that admissibility "depends . . . on 'the proffered connection between the scientific research or test

---

[37]  35 F.3d 717, 730 (3d Cir. 1994).
[38]  Id. at 741–43.
[39]  Id. at 741.
[40]  See id.
[41]  See id. at 742 (quoting Daubert, 509 U.S. at 589).
[42]  See Paoli II, 35 F.3d at 742 n.8.

result . . . and [the] particular disputed factual issues.'"[43] In recognition then of

Paoli II's interpretation of Daubert, Third Circuit courts confronting expert witness

issues have recognized that admissibility requires a proffered expert to surpass "a

trilogy of restrictions": qualification, reliability and fit.[44]

"Determinations regarding the weight to be accorded, and the sufficiency of,

the evidence relied upon by the proffered expert, are within the sole province of the

jury."[45] Thus, Rule 702 has been said to embrace "a liberal policy of

admissibility."[46]

## III.   ANALYSIS

### A.   Neither Mr. Rappucci Nor Any Other Expert May Offer Legal Conclusions As To Whether National Beef Violated The ADA.

The parties to this dispute have stumbled upon a schizophrenic area of the

law, an evidentiary dispute unamenable to bright line rules and more intricate than

is first apparent. Specifically, Federal Rule of Evidence 704(a), the provision

regulating expert testimony on an ultimate issue, deceptively states that "[a]n

opinion is not objectionable just because it embraces an ultimate issue." That

seemingly clear expression favoring (or at least not disfavoring) admissibility

belies an extensive body of case law that has applied a more discerning approach

---

[43] See id. at 743 (quoting United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)).

[44] See Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

[45] Walker v. Gordon, 46 F. App'x 691, 695 (3d Cir. 2002).

[46] Paoli II, 35 F.3d at 741.

to expert opinions that go to an ultimate issue.

As the Third Circuit stated in <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, a leading decision on the subject, "an expert witness is prohibited from rendering a legal opinion."[47] Several circuit courts have adopted this stringent view and have offered several justifications for this outright bar on legal opinions by expert witnesses.[48] For example, the Third Circuit has explained that a restrictive approach to expert opinions on an ultimate issue guards against an expert "usurp[ing] the District Court's pivotal role in explaining the law to the jury,"[49] prevents a witness from "invad[ing] the province of the jury,"[50] and avoids a party's "attempting to introduce law as evidence."[51]

Though the Advisory Committee Notes to Federal Rule 704 indicate a preference for a "helpful[ness] to the trier of fact" standard over a stringent "ultimate issue rule," such preference has provided little guidance for federal courts. As those Advisory Committee Notes state, "[A]bolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for

---

[47] 455 F.3d 195, 217 (3d Cir. 2006).
[48] <u>See, e.g.</u>, <u>Specht v. Jensen</u>, 853 F.2d 805 (10th Cir. 1988); <u>Marx & Co. v. Diners' Club, Inc.</u>, 550 F.2d 505 (2d Cir. 1977); <u>Adalman v. Baker, Watts & Co.</u>, 807 F.2d 359 (4th Cir.1986); <u>Owen v. Kerr–McGee Corp.</u>, 698 F.2d 236 (5th Cir.1983); <u>United States v. Zipkin</u>, 729 F.2d 384 (6th Cir.1984).
[49] <u>Berckeley</u>, 455 F.3d at 217.
[50] <u>United States v. Downing</u>, 753 F.2d 1224, 1229 (3d Cir. 1985).
[51] <u>United States v. Leo</u>, 941 F.2d 181, 197 (3d Cir. 1991).

exclusion of evidence which wastes time." Thus, taken together, Rules 403, 701, 702, and 704 "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria."[52]

In attempting to clarify when an expert runs afoul of the Federal Rules of Evidence when offering ultimate opinions, the Advisory Committee Notes to Rule 704 offer the following helpful example:

> Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Interpreting this example, the United States Court of Appeals for the Tenth Circuit has stated that a trial court's primary inquiry is "distinguishing between testimony on issues of law and testimony on ultimate facts," where "testimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the case."[53] According to the Tenth Circuit, district courts should thus exclude testimony that "simply tell[s] the jury to reach a particular verdict based on [the expert's] own say-so."[54] Similarly, the United States Court of Appeals for the Sixth Circuit has explained that expert

---

[52] Fed. R. Evid. 704, Adv. Comm. Notes.
[53] Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988).
[54] United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005).

testimony as to an ultimate issue is inappropriate when "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular."[55] In like manner, the United States Court of Appeals for the District of Columbia Circuit illustrated the distinction between "impermissible legal conclusions" and "permissible factual opinions" with the following example: "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."[56]

This distinction becomes particularly hazy, however, in cases such as this one, which involve statutory schemes, legal terms of art, and specialized practices that fall well beyond the scope of lay person's common knowledge. As the Third Circuit stated in Berckeley, "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties."[57] The paradox is apparent: jurors in ADA cases require a certain contextualization of the applicable law and the vocational practices the ADA has spawned, yet the ultimate determination as to liability must remain the jury's and the jury's alone.

---

[55] Torres v. Cty. of Oakland, 758 F.2d 147, 151 (6th Cir. 1985).
[56] Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1212–13 (D.C. Cir. 1997).
[57] 455 F.3d at 218.

Yet, this Court believes that <u>Berckeley</u> and the cases upon which <u>Berckeley</u> relies provide a helpful framework for the parties here and therefore are also an appropriate starting point for the instant discussion. <u>Berckeley</u> involved expert testimony offered to controvert alleged violations of the federal securities laws.[58] As a starting point, the Third Circuit recognized in <u>Berckeley</u> that although previous cases considered it permissible for an expert "to testify as to the established custom in [a given] industry," it was not appropriate for the expert "to give his opinion as to the legal duties arising from the industry custom."[59] Similarly, the <u>Berckeley</u> court emphasized that the "[k]ey to our determination" in previous cases "was that the expert did not give his opinion as to what was required under the law, or whether the defendant complied with the Act."[60] Instead, where such testimony was permissible, the expert testified as to business custom "based upon his experience in the [ ] industry."[61]

Addressing the contested expert testimony in <u>Berckeley</u>, the Third Circuit observed that the witness's "background testimony could be helpful to the jury."[62] The witness was "an experienced former counsel for the SEC with expertise in

---

[58] <u>Id.</u>

[59] <u>Id.</u> (citing <u>First Nat. State Bank of New Jersey v. Reliance Elec. Co.</u>, 668 F.2d 725 (3d Cir. 1981) (analyzing expert testimony that went to the "holder in due course" provision of the Uniform Commercial Code)).

[60] <u>Berckeley</u>, 455 F.3d at 218 (citing <u>Leo</u>, 941 F.2d at 196–97 (analyzing expert testimony that went to the Armed Services Procurement Act)).

[61] <u>Berckeley</u>, 455 F.3d at 218 (quoting <u>Leo</u>, 941 F.2d at 197).

[62] <u>Berckeley</u>, 455 F.3d at 218.

offshore securities transactions."[63] Testimony as to "[t]he customs and business practices in the securities industry" at the relevant time "provides an important context which will aid the jury" in making its ultimate determination.[64] Thus, although testimony as to business custom in light of given legislation was admissible, it would not be admissible for that expert to testify "as to whether [a party] complied with legal duties that arose under the federal securities laws."[65] This prohibition extended to testimony regarding "the legal effect of the various SEC pronouncements" as well as to whether it was reasonable for a party to believe that it was entitled to a securities law exemption.[66]

In the context of ADA litigation, several federal courts have applied Federal Rule of Evidence 704 to exclude expert testimony offering direct legal conclusions about such ultimate issues as whether a plaintiff "was disabled or impaired"[67] and whether a defendant "failed to engage in a meaningful interactive process;"[68] "engaged in discriminatory practices with reckless indifference;"[69] or provided "a

---

[63] Id.
[64] Id.
[65] Id.
[66] Id.
[67] Candlehouse, Inc. v. Town of Vestal, N.Y., No. 3:11-CV-0093 DEP, 2013 WL 1867114, at *22 (N.D.N.Y. May 3, 2013).
[68] James Vaughn v. Safeway, Inc., No. 14-CV-01066-REB-NYW, 2015 WL 7307936, at *3 (D. Colo. Nov. 20, 2015).
[69] Id.

reasonable accommodation."[70] As this Court indicated during its October 19, 2015 Daubert hearing, it is similarly prepared to exclude such legal conclusions in this case. Therefore, as applied to each of the specific ADA opinions that follow in the subsequent sections of this discussion, Mr. Rappucci (as well as any other expert offered by either party) may testify to those facts that bear upon the ultimate issue but may not state any blunt legal conclusion as to whether National Beef violated any portion of the ADA.

This means that expert witnesses in this case may not testify to any of the following issues in the form of direct legal conclusions: (i) whether Ms. Orner was "a qualified individual with a disability;" (ii) whether National Beef failed to "adequately engage in the interactive process;" (iii) whether the proposed sit-stand stool was a "reasonable accommodation;" (iv) whether implementation of the sit-stand stool would pose a "direct threat" to Ms. Orner or others; or (v) whether the sit-stand stool would not pose an "undue hardship" to National Beef.

However, this prohibition does not mean that expert testimony that goes to any of those issues is per se inadmissible. To the contrary, this Court expects that factual testimony, which is based upon the experts' experience, research, and review of the record and which helps the jury reach its own legal conclusion as to each of these core ADA issues, will comprise the majority of the substantive

---

[70] Donelson v. Providence Health & Servs.-Washington, 823 F. Supp. 2d 1179, 1193 (E.D. Wash. 2011).

testimony at trial. Thus, for example, the experts will be able to generally discuss the standard business practices typically implemented to facilitate the interactive process through which employees can make ADA requests; the leading treatises and related EEOC guidance upon which employers and experts generally rely; and typical considerations that experts and employers use to determine whether a requested accommodation is reasonable or would pose a direct threat in a given workplace. The experts, based upon their own research and investigation, may, for example, factually describe the sort of interactive process implemented at National Beef and discuss the particular factual considerations that indicate whether the sit-stand stool was reasonable or would pose a direct threat.[71] The experts' testimony must stop, however, before reaching either of the following general topics: (i) the particular legal duties that the ADA imposes upon employers or (ii) whether National Beef complied with those duties in this case. The former topic is solely the responsibility of this Court; the latter determination is for the jury to decide. This Court also respectfully reminds both parties that it will look unfavorably upon any attempt to circumvent this or any other pretrial ruling during the course of trial.

**B.     Mr. Rappucci's Methodology Is Sufficiently Reliable Under <u>Daubert</u> And <u>Paoli II</u>, But His Testimony Will Be Subject To Thorough Cross-Examination And Is Limited As Follows.**

---

[71] Further explanation is afforded to each of these particular ADA opinions in the subsequent sections, given that the Court has found the majority of Mr. Rappucci's methodology and testimony sufficiently reliable for the purposes of admission in federal court under <u>Daubert</u> and <u>Paoli II</u>.

Based on the Court's review of the case law dealing with vocational rehabilitation experts as well as the particular methodology undertaken by Mr. Rappucci, the Court concludes that Mr. Rappucci's work is sufficiently reliable under Rule 702 to warrant admissibility. As detailed more fully below, Defendant will enjoy wide latitude in cross-examining Mr. Rappucci on certain issues (whether the sit-stand stool was a "reasonable accommodation"; whether Plaintiff was a statutory "qualified individual" with that accommodation; and whether it posed a "direct threat" to others). In addition to the bar on legal conclusions set forth above in Part III.A, Mr. Rappucci will not be able to testify as to whether Plaintiff had a "disability" under the ADA or whether the proposed accommodation posed a "direct threat" to Plaintiff herself. Those latter two areas are more appropriately the province of Plaintiff's medical expert, Dr. Glass.

Defendant principally relies on two cases, Elcock v. Kmart Corp.[72] and Oddi v. Ford Motor Co.[73] Elcock involved the exclusion of a proffered vocational rehabilitation expert intended to testify as to the lost earnings capacity of a plaintiff in a slip-and-fall torts suit.[74] There are significant differences between the instant case and Elcock. First, the contested expert in Elcock, unlike Mr. Rappucci here, "admitted that he had neither the academic training nor the standard credentials

---

[72]  233 F.3d 734 (3d Cir. 2000).
[73]  234 F.3d 136 (3d Cir. 2000).
[74]  233 F.3d at 740.

that would ordinarily qualify one as an expert in vocational rehabilitation."[75] The

Elcock court noted that "this marginal nature of [the witness's] qualifications"

necessarily "enter[s] into the Daubert calculus."[76] To the contrary, Mr. Rappucci

has over forty years of experience in the vocational rehabilitation arena.[77]

Moreover, as far as the legitimacy of the chosen methodology goes, the

excluded expert in Elcock offered "an idiosyncratic or subjective judgment in

which the result can neither be duplicated nor tested for validity"—a broken (or

non-existent) methodology that involved random changes in estimates and was

largely "untested," "novel," and "arbitrary."[78] Not so here. Mr. Rappucci reviewed

two pertinent ADA treatises, met with Plaintiff, obtained estimates of her physical

tolerances, visited Defendant's facility, measured the work area, observed the

environment where Plaintiff would perform her job, and researched potential sit-

stand stools that he felt would satisfy her needs without posing a hazard to others.

The Court finds that to be a sufficiently reliable methodology because, importantly,

it can be replicated, tested, verified, or debunked by Defendant's own experts.

Similarly, Oddi v. Ford Motor Co involved the exclusion of an engineer who

was retained to testify about the alleged defective design in the bumper of a Ford

---

[75] Id. at 741.
[76] 233 F.3d at 744.
[77] ECF No. 77 Ex. 1 at 23.
[78] 233 F.3d at 746–48.

truck that was involved in a catastrophic accident.[79] The expert in <u>Oddi</u> testified

that the truck involved in the collision was defectively designed, but "was unable

to identify any particular literature that he relied upon to form any of the opinions

contained in his preliminary report."[80] Mr. Rappucci's work, however, is not so

untethered from scholarly literature in the form of EEOC guidance on

implementation of the ADA. Moreover, the expert in <u>Oddi</u> failed to make several

key findings related to the force of the accident, the capacity of the bumper, etc.[81]

Certain of his findings were even openly "undermined by the [ ] laws of physics."[82]

Even if imperfect, Mr. Rappucci relied upon sufficient measurements and

observations in forming his opinions to at least allow his work to surpass <u>Daubert</u>'s

requirements.

    This Court believes that Mr. Rappucci's admission as an expert is consistent

with several other federal decisions on this topic. For instance, in <u>Hamilton v.

Emerson Elec. Co.</u>, the Honorable James F. McClure, Jr., writing for this Court,

found it proper to exclude an expert who, unlike Mr. Rappucci, "did not . . . do any

analysis," "did not do any independent examination or evaluation," and "[did] not

use any discernible methodology."[83] The same is true when comparing Mr.

Rappucci's methodology in this case to that at issue in a decision by the United

---

[79]  234 F.3d 136.
[80]  <u>Id.</u> at 148.
[81]  <u>See id.</u> at 149.
[82]  <u>See id.</u> at 157.
[83]  133 F.Supp.2d 360, 367–71 (M.D. Pa. 2001).

States Court of Appeals for the Seventh Circuit that resulted in exclusion of an

expert whose testimony "[was] not based on any specific methodology applied to

the facts but [was] only unsupported speculation."[84]

As the Elcock court explained, "[v]ocational rehabilitation is a social science

that does not exactly mirror the fundamental precepts of the so-called harder

sciences. However, the gist of the above Daubert factors are nonetheless

implicated."[85] The precise issue here as highlighted by the Court's Daubert

hearing, is the minimum threshold of testing, measurement, and analysis required

of a vocational rehabilitation analyst before he may be admitted as an expert. Does

the analyst need to actually test the accommodation out with the subject of the

litigation? And for how long? Plaintiff cites to Weirich v. Horst Realty Co., LLC,

which explained that "[d]espite Defendant's implication, vocational experts, like

medical and other experts, 'are not required to review every record or perform

every conceivable test' in order to reach a reliable conclusion that has proper

factual support."[86]

The reality is that prolonged testing mimicking actual performance of one's

everyday duties, is simply not a feasible option at times. That does not mean that it

is never warranted or that there is not a minimum level of demonstration that

---

[84] Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 815 (7th Cir. 2004).
[85] Elcock, 233 F.3d at 747.
[86] No. CIV. A. 07-CV-871, 2009 WL 920960, at *5 (E.D. Pa. Mar. 30, 2009).

would aid a party's admissibility efforts as well as its chances of success on the

underlying merits. That being said, given the nature of a vocational rehabilitation

analyst's work, it is reasonable for a certain amount of research, investigation, and

consultation with the injured individual to substitute for a thorough nine to five

demonstration under real-time workplace conditions. That line will often be a fact-

dependent one, and based upon the facts and procedural history of this case, the

Court is satisfied that Mr. Rappucci's methodology has met that minimum

threshold.[87]

The parties are reminded, however, that the Court's preceding discussion

here is limited solely to the threshold issue of admissibility and is not meant to any

way bear upon Mr. Rappucci's potential credibility. As evidenced by certain of the

issues that the parties analyzed during the Court's Daubert hearing, the threshold

admissibility determination here was not an easy one, particularly as it relates to

the issues of reasonable accommodation and direct threat. Whereas certain experts

effortlessly clear the hurdle of admissibility, based on this Court's review of the

pertinent reports and deposition testimony, Mr. Rappucci might graciously be

described as having grazed that hurdle on his way over, leaving it wobbling as he

---

[87] A related question raised by counsel but not addressed during the Daubert hearing was the feasibility of an on-site visit to Defendant's facility. To best orient the parties' expectations, this Court would be unlikely to grant such a request and would instead be inclined to follow the analysis of the Honorable John A. Woodcock, Jr., in Rooney v. Sprague Energy Corp., 495 F. Supp. 2d 135, 138 (D. Me. 2007) ("The disadvantages of lost trial time, additional expense, and potential legal pitfalls substantially outweigh whatever slight incremental advantage, if any, an on-site visit would have over the presentation of alternative evidence.").

passed by.

Nevertheless, this Court believes that the apparent shortcomings in Mr. Rappucci's report and testimony are better addressed through vigorous cross-examination than through threshold exclusion, as they go primarily to the credibility, completeness, and thoroughness of his recommendations rather than to the preliminary validity of a vocational rehabilitation expert's methodology.[88] As the Third Circuit has explained:

> Courts have held in numerous other cases that credibility is irrelevant to determining whether a proposed expert witness's testimony is admissible under Rule 702, and particularly whether it is based on reliable methodology. See, e.g., Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1138-39 (3d Cir.1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.") . . . Similarly, factual errors in a witness's testimony are not grounds for excluding the witness from testifying as an expert. See Paoli II, 35 F.3d at 753–54. Finally, general attacks on credibility based on a lack of personal knowledge are not a proper basis for excluding expert testimony. See Dixon v. International Harvester Co., 754 F.2d 573, 580 (5th Cir.1985).[89]

In the Court's view, then, admission here is largely proper, and a close cross-examination will permit Defendant to adequately vet Mr. Rappucci's recommendations for the jury's benefit, a vetting that is appropriate in light of

---

[88] The Court finds instructive comparison of the instant dispute to Bruno v. Bozzuto's, Inc., No. 3:09-CV-874, 2015 WL 7294464, at *15 (M.D. Pa. Nov. 19, 2015) (excluding experts whose methodological flaws "call[ed] into question the very corpus of the reports themselves" and therefore were unamenable to "to minor correction by the factfinder on the basis of some credibility determination").

[89] In re Unisys Sav. Plan Litig., 173 F.3d 145, 166 n.11 (3d Cir. 1999).

certain of the alleged omissions in Mr. Rappucci's analysis. To that end, both parties should expect the Court to afford Defendant's counsel wide latitude on its cross-examination of Mr. Rappucci. I anticipate that little will be off limits, and Mr. Rappucci will be expected to testify fully to as to why he did not test Ms. Orner in any capacity;[90] why he relied primarily on tolerance estimates self-reported by Ms. Orner;[91] why certain measurements were irrelevant to his analysis;[92] and why he did not conduct a functional capacity evaluation (FCE) of Ms. Orner.[93]

Such latitude will be especially wide in the likely event that Defendant's counsel wishes to question Mr. Rappucci about his determinations that the sit-stand stool is a reasonable accommodation that would not pose a direct threat to others, opinions that although admissible under Rule 702, may raise serious logistical doubts in any reasonable juror's mind given the particular workplace setting at issue. This wide latitude will naturally extend to any discussion by Mr. Rappucci as to whether Plaintiff was a "qualified individual" under 42 U.S.C. § 12111(8). Given that Mr. Rappucci's opinion of the sit-stand stool as a reasonable accommodation that does not pose a direct threat is arguably that most called into question by his alleged lack of thoroughness, the Court finds it fitting that

---

[90] ECF No. 77 Ex. 2 at 6.
[91] Id. at 7, 17.
[92] Id. at 11–14.
[93] Id. at 18.

Defendant's counsel be afforded significant leeway to question Mr. Rappucci on those particular conclusions in the presence of the jury. In that vein, the Court believes that how the jury receives Mr. Rappucci's testimony will play a significant role in whether they judge Ms. Orner's claim meritorious or unavailing.

As compared to his analysis on reasonable accommodation and direct threat, the soundest portion of Mr. Rappucci's report is his analysis of the interactive process that played out between National Beef and Ms. Orner. Mr. Rappucci devotes five pages of his report to reviewing the pertinent manuals, analyzing deposition testimony and correspondence between the parties, and discussing the particulars associated with implementation of the sit-stand stool for Ms. Orner. In the Court's view, this particular portion of Mr. Rappucci's testimony will be quite helpful to the jury. This is especially true in light of Plaintiff's core contention that National Beef and its representatives did not adequately engage in the interactive process with Ms. Orner. Based on Mr. Rappucci's background and deposition testimony, his explanation of the interactive process and related concepts also seems to be the area in which he is most qualified and with which he has the most experience. As such, although he may not testify to any specific legal conclusions as explained in Part III.A above, Mr. Rappucci will be afforded the widest latitude as it pertains to his discussion of the interactive process.

Last, there are certain ADA issues about which this Court deems it improper

for Mr. Rappucci to testify. Those two primary areas that are beyond the bounds of his expertise, as acknowledged by Plaintiff during the Court's <u>Daubert</u> hearing, are whether Plaintiff was "disabled" under the ADA as well as whether the sit-stand stool would pose a "direct threat" to Plaintiff. Both of those issues are more appropriately addressed by Plaintiff's medical expert, neurologist Dr. Jon Glass, on direct and cross-examination. Mr. Rappucci's testimony, by virtue of his training as a vocational rehabilitation analyst, will thus be limited to the issues of reasonable accommodation, qualified individual status, and direct threat to others. Finally, the Court considers it improper for Mr. Rappucci to opine as to whether the sit-stand stool would pose an undue hardship for Defendant. He may testify as to the price of the device, but his analysis should end there.

## IV.   CONCLUSION

This is a dispute in which each party suggests that the other "stopped short" of what the ADA requires. According to Defendant, Plaintiff's expert Mr. Rappucci stopped short of fully investigating and analyzing what might constitute a reasonable accommodation. On the other hand, Plaintiff, through Mr. Rappucci, suggests that Defendant stopped short of fulfilling its obligations under the ADA by failing to adequately engage in the interactive process. As occasionally is the case in a dispute such as this, perhaps there is some truth to both positions.

In light of this consideration, the Court would encourage both parties to put

serious thought into the best way to resolve the instant dispute. Although, as this Court has repeatedly indicated, it will be prepared to oversee a jury trial commencing two months from now, the litigants are now in a better position than they have ever been to evaluate the strengths and weaknesses of each side's case. Given these newly settled expectations about a February 2016 trial, the parties may decide that coming to a cooperative resolution in a case like this is a far preferable option to punting that determination to a jury of eight laypeople unschooled in the ADA, a delegation that could have undesired consequences for either party if it is true that both have indeed "stopped short."

An appropriate Order follows.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge